UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBIN R. BELL,<br><br>                *Plaintiff,*<br><br>      v.<br><br>GINA RAIMONDO,<br>Secretary of Commerce,<br><br>              *Defendant*. | Civil Action No. 19-3109 (CJN) |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendant Gina Raimondo, in her official capacity as Secretary of the United States Department of Commerce, respectfully moves for summary judgment on the remaining claims asserted in the amended complaint filed by Plaintiff Robin Bell.  In support of this Motion, Defendant respectfully refers the Court to the Statement of Material Facts, Exhibits, and Memorandum of Points and Authorities.  A proposed order is also attached.

\*     \*     \*

Dated: July 25, 2022

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK,
Chief, Civil Division

*/s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
United States Attorney's Office
Civil Division
601 D Street, N.W.
Washington, D.C. 20530
Stephanie.Johnson5@usdoj.gov

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBIN R. BELL, | |
| *Plaintiff,* | |
| v. | Civil Action No. 19-3109 (CJN) |
| GINA RAIMONDO,<br>Secretary of Commerce, | |
| *Defendant.* | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

# **TABLE OF CONTENTS**

Table of Contents ........................................................................................................ i

Table of Authorities ................................................................................................... ii

List of Exhibits ........................................................................................................ viii

Introduction ............................................................................................................... 1

Factual Background ................................................................................................... 2

Procedural Background............................................................................................ 13

Legal Standard ........................................................................................................ 14

Argument ................................................................................................................ 15

    I.     Plaintiff's Complaint Should Be Dismissed Because Plaintiff Was a Contractor, Not A Federal Employee, and Thus May Not Sue the Government Under Title VII ....................................................................................................... 15

    II.    Alternatively, Plaintiff Cannot Establish a Claim for Retaliatory Discharge (Count I).................................................................................................................... 20

          A.    Legal Standard Regarding Retaliation Claims.......................................... 20

          B.    Plaintiff's Retaliation Claim Must Be Dismissed Because Plaintiff Can Not Demonstrate That She Participated in A Statutorily Protected Activity). 22

          C.    Plaintiff Cannot Establish a Causal Connection Between Her EEO Activity and Removal from the Contract. ............................................................. 25

          D.    The Agency Had Legitimate, Non-Retaliatory, Reasons for Its Decision, and Plaintiff Cannot Identify Any Evidence from Which Pretext May Be Inferred. ................................................................................................ 26

    III.    Retaliatory Hostile Work Environment (Count II) Claim Fails............................ 31

Conclusion ............................................................................................................. 36

# TABLE OF AUTHORITES

**Cases**                                                                                                    **Page**

*Achagzai v. Broad. Bd. of Governors*,
170 F. Supp. 3d 164 (D.D.C. 2016) ........................................................................................31, 35

*Adeyemi v. District of Columbia*,
525 F.3d 1222 (D.C. Cir. 2008) ..............................................................................................29, 31

*Akonji v. Unity Healthcare, Inc.*,
517 F. Supp. 2d 83 (D.D.C. 2007) ................................................................................................33

*Akosile v. Armed Forces Ret. Home*,
141 F. Supp. 3d 75 (D.D.C. 2015) ................................................................................................30

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................................. 14-15

*Ayissi-Etoh v. Fannie Mae*,
712 F.3d 572 (D.C. Cir. 2013) .......................................................................................................35

*Baird v. Gotbaum*,
792 F.3d 166 (D.C. Cir. 2015) .......................................................................................................34

*Baloch v. Kempthorne*,
550 F.3d 1191 (D.C. Cir. 2008) ..........................................................................................27, 31, 34

*Batson v. Powell*,
912 F. Supp. 565 (D.D.C. 1996) ...................................................................................................27

*Broderick v. Donaldson*,
437 F.3d 1226 (D.C. Cir. 2006) ................................................................................................ 23-24

*Brooks v. Grundmann*,
748 F.3d 1273 (D.C. Cir. 2014) .....................................................................................................33

*Brooks v. Grundmann*,
851 F. Supp. 2d 1 (D.D.C. 2012) ..................................................................................................33

*Brady v. Office of Sergeant at Arms*,
520 F.3d 490 (D.C. Cir. 2008) ..................................................................................................21, 29

*Bridgeforth v. Jewell*,
721 F.3d 661 (D.C. Cir. 2013) ................................................................................................. 20-21

*Bryant v. The Orkand Corp.*,
407 F. Supp. 2d 29 (D.D.C. 2005) ................................................................................................17

*Burkes v. Holder*,
953 F. Supp. 2d 167 (D.D.C. 2013) ............................................................31

*Burlington N. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006) ...................................................................................20

*Carter v. Greenspan*,
304 F. Supp. 2d 13 (D.D.C. 2004) .......................................................25, 28

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ..................................................................................14

*Clark Cnty. Sch. Dist. v. Breeden*
532 U.S. 268 (2001) ..................................................................................25

*Drewrey v. Clinton*,
763 F. Supp. 2d 54 (D.D.C. 2011) ..............................................................27

*EEOC v. Sunbelt Rentals, Inc.*,
521 F.3d 306 (4th Cir. 2008) ......................................................................32

*Faragher v. City of Boca Raton*,
524 U.S. 775 (1998) ........................................................................ 32-33, 35

*Figueroa v. Pompeo*,
923 F.3d 1078 (D.C. Cir. 2019) ..................................................................26

*Fischbach v. D.C. Dep't of Corr.*,
86 F.3d 1180 (D.C. Cir. 1996) ........................................................... 20, 28-30

*Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*,
136 F.3d 276 (2d Cir. 1998) .......................................................................24

*George v. Leavitt*,
407 F.3d 405 (D.C. Cir. 2005) ...............................................................23, 27

*Gilbert v. Napolitano*,
670 F.3d 258 (D.C. Cir. 2012) ....................................................................22

*Giles v. Transit Emps. Credit Union*,
32 F. Supp. 3d 66 (D.D.C. 2014) ................................................................28

*Gonda v. Donahoe*,
79 F. Supp. 3d 284 (D.D.C. 2015) ..............................................................27

*Greene v. Dalton*,
164 F.3d 671 (D.D.C. 1999) .......................................................................30

*Grosdidier v. Broad. Bd. of Governors*,
709 F.3d 19 (D.C. Cir. 2013) ............................................................................14, 22, 32

*Hardin v. S.C. Johnson & Son, Inc.*,
167 F.3d 340 (7th Cir. 1999) ........................................................................................34

*Harris v. Att'y Gen.*,
657 F. Supp. 2d 1 (D.D.C. 2009) ..................................................................................17

*Harris v. D.C. Water & Sewer Auth.*,
791 F.3d 65 (D.C. Cir. 2015) ........................................................................................22

*Harris v. Forklift Sys.*,
510 U.S. 17 (1993) ........................................................................................................31

*Hastie v. Henderson*,
121 F. Supp. 2d 72 (D.D.C 2000) .................................................................................30

*Holcomb v. Powell*,
33 F.3d 889 (D.C. Cir. 2006) ........................................................................................14

*Horne v. Reznick, Fedder & Silverman*,
154 F. App'x 361 (4th Cir. 2005) .................................................................................25

*Hussain v. Gutierrez*,
593 F. Supp. 2d 1 (D.D.C. 2008) ..................................................................................27

*Int'l Union v. Clark*,
Civ. A. No. 02-1484, 2006 WL 2598046 (D.D.C. 2006) .............................................17

*Jones v. Bernanke*,
557 F.3d 670 (D.C. Cir. 2009) ......................................................................................21

*Jones v. Billington*,
12 F. Supp. 2d 1 (D.D.C. 1997) ....................................................................................34

*Jones v. D.C. Water & Sewer Auth.*,
Civ. A. No. 12-1424 (JEB), 2016 WL 659666 (D.D.C. Feb. 18, 2016) .......................27

*Laningham v. Dep't of Navy*,
813 F.2d 1236 (D.C. Cir. 1987) ....................................................................................15

*McDonnell Douglas Corp. v. Green*,
411 U.S. 792 (1973) ................................................................................................21, 26

*McGrath v. Clinton*,
666 F.3d 1377 (D.C. Cir. 2012) ................................................................. 20, 22-23, 29

*McLee v. Chrysler Corp.*,
109 F.3d 130 (2d Cir. 1997)..................................................................................................25

*McNally v. Norton*,
498 F. Supp. 2d 167 (D.D.C. 2007) ......................................................................................28

*Milton v. Weinberger*,
696 F.2d 94 (D.C. Cir. 1982) ................................................................................................29

*Mitchell v. Baldrige*,
759 F.2d 80 (D.C. Cir. 1985) ................................................................................................20

*Mohmand v. Broad. Bd. of Governors*,
Civ. A. No. 17-0618, 2018 WL 4705800 (D.D.C. 2018) ......................................................31

*Nat'l R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002)...............................................................................................................31

*Nationwide Mut. Ins. Co. v. Darde*,
503 U.S. 318 (1992)...............................................................................................................16

*NLRB v. Browning–Ferris Indus. of Pa., Inc.*,
691 F.2d 1117 (3d Cir. 1982).................................................................................................17

*Nurriddin v. Goldin*
382 F. Supp. 2d 79 (D.D.C. 2005) ........................................................................................34

*Oncale v. Sundowner Offshore Servs.*,
523 U.S. 75 (1998)............................................................................................................25, 32

*Peters v. District of Columbia*,
873 F. Supp. 2d 158 (D.D.C. 2012) ......................................................................................33

*Rattigan v. Gonzales*,
503 F. Supp. 2d 56 (D.D.C. 2007) ........................................................................................24

*Rattigan v. Holder*,
982 F. Supp. 2d 69 (D.D.C. 2013) ........................................................................................21

*Richardson v. Gutierrez*,
477 F. Supp. 2d 22 (D.D.C. 2007) ........................................................................................20

*Richardson v. New York State Dep't of Corr. Serv.*,
180 F.3d 426 (2d Cir. 1999)...................................................................................................34

*Rochon v. Gonzales*,
38 F.3d 1211 (D.C. Cir. 2006) .........................................................................................15, 20

*Román v. Castro,*
149 F. Supp. 3d 157 (D.D.C. 2016) ...................................................................31

*Royall v. Nat'l Ass'n of Letter Carriers,*
507 F. Supp. 2d 93 (D.D.C. 2007) ....................................................................27

*Scott v. Harris,*
550 U.S. 372 (2007) ...........................................................................................14

*Simms v. Dist. of Columbia,*
587 F. Supp. 2d 269 (D.D.C. 2008) ..................................................................16

*Singh v. U.S. House of Representatives,*
300 F. Supp. 2d 48 (D.D.C. 2004) ....................................................................33

*Sitar v. Ind. Dep't of Transp.,*
344 F.3d 720  (7th Cir. 2003) ............................................................................24

*Spirides v. Reinhardt,*
613 F.2d 826 (D.C. Cir. 1979) ..................................................................... 15-16

*St. Mary's Honor Ctr. v. Hicks,*
509 U.S. 502 (1993) ...........................................................................................29

*Stewart v. Evans,*
75 F.3d 1126 (D.C. Cir. 2002) ..........................................................................33

*Taylor v. Mills,*
892 F. Supp. 2d 124 (D.D.C. 2012) ..................................................................22

*Trawick v. Hantman,*
151 F. Supp. 2d 54 (D.D.C. 2001) ....................................................................26

*Tyes-Williams v. Whitaker,*
361 F. Supp. 3d 1 (D.D.C. 2019) ......................................................................33

*Univ. of Tex. S.W. Med. Ctr. v. Nassar,*
570 U.S. 338 (2013) ...................................................................................... 20-21

*Vatel v. All. of Auto. Mfrs.,*
627 F.3d 1245 (D.C. Cir. 2011) ........................................................................30

*Walker v. Johnson,*
798 F.3d 1085 (D.C. Cir. 2015) ........................................................................29

*Waterhouse v. District of Columbia,*
124 F. Supp. 2d 1 (D.D.C. 2000) ......................................................................28

*Webster v. Dep't of Energy*,
443 F. Supp. 3d 67 (D.D.C. 2020) ............................................................................................ 27

*Zhengxing v. Nathanson*,
215 F. Supp. 2d 114 (D.D.C. 2002) .......................................................................................... 17


**Statutes, Regulations, Rules, and Other Authorities**

42 U.S.C. § 2000e ........................................................................................ 15-16, 20, 22

Fed. R. Civ. P. 56 ............................................................................................... 1, 14

## **<u>LIST OF EXHIBITS</u>**

Exhibit A – Pl. Tr.

Exhibit B – Ardent Human Resource Assistant candidate email

Exhibit C – Contractor Questionnaire - Kram

Exhibit D – Questionnaire - Hawthorne

Exhibit E – Contract

Exhibit F – Phillips Tr.

Exhibit G – Jan. 8, 2018, email

Exhibit H – Jan. 23, 2018, email

Exhibit I – Nov. 28, 2017, email thread

Exhibit J – Pl.'s Resume

Exhibit K – Hawthorne Tr.

Exhibit L – Robinson Tr.

Exhibit M – Nov. 29 - Dec. 5, 2017

Exhibit N – January 23-24

Exhibit O – Dec. 1 - 7, 2017

Exhibit P – Nov. - Dec. 2017

Exhibit Q – Nov. 28, 2017 – Jan. 6, 2018

Exhibit R – Sep. 2017 – Dec. 2017

Exhibit S – Nov. 30 - Dec. 7, 2017

Exhibit T – Jan. 8, 2018

Exhibit U – Dec. 2017 – Jan. 2018

Exhibit V – Nov. 21, 2017

Exhibit W – Dec. 14, 2017

Exhibit X – Jan. 4, 2018

Exhibit Y – Dec. 21, 2017, email

Exhibit Z – Mitchell Tr.

Exhibit AA – Dec. 22, 2017, email

Exhibit BB – Dec. 26, 2017, email

Exhibit CC – Marlene Statement

Exhibit DD – Jan. 10, 2018, email

Exhibit EE – Jan. 9, 2018, email

Exhibit FF – Jan. 11, 2018, deficiency email

Exhibit GG – Jan. 11, 2018, email

Exhibit HH – Email from Kram to Ardent

Exhibit II – Counseling Report

Exhibit JJ – Pl.'s EEO Compl. and Supporting Docs.

Exhibit KK – FAD

Exhibit LL – Training Meeting Invite

Defendant Gina Raimondo, in her official capacity as Secretary of the United States Department of Commerce ("Defendant" or the "Agency"), respectfully moves for summary judgment in this action pursuant to Federal Rule of Civil Procedure ("Rule") 56.

## INTRODUCTION

In her Amended Complaint, Plaintiff Robin Bell ("Plaintiff") alleged gender discrimination, retaliation, and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"); age discrimination in violation of the Age Discrimination in Employment Act; and disability discrimination in violation of the Rehabilitation Act of 1973. *See* ECF No. 29-1, Am. Compl. Following earlier motions practice and this Court's March 21, 2021, decision, ECF No. 39, the only remaining issues in this case are whether Plaintiff was jointly employed with the Agency, and her Retaliatory Discharge (Count I) and Retaliatory Hostile Work Environment (Count II) claims.

Defendant is entitled to judgment in its favor on each remaining claim in this suit because there are no material facts in dispute and, even when considered in a light most favorable to Plaintiff, Plaintiff's claims fail for several reasons. First, Plaintiff was a contractor, not a federal employee or jointly employed by the Agency, and therefore as a contractor she is unprotected under Title VII. Second, Plaintiff's retaliation claims fail because Plaintiff is unable to demonstrate that she took part in "statutorily protected activity" or that she "had brought or threatened to bring a discrimination claim," nor can Plaintiff demonstrate a causal connection between the alleged protected activity and adverse personnel action or the alleged protected activity and hostile behavior. Further, the Agency had legitimate, non-retaliatory reasons for its actions and Plaintiff cannot point to any evidence of pretext and cannot establish that the true reason for any of the Agency's actions was retaliatory animus. Lastly, Plaintiff's retaliatory hostile

work environment claim also fails because the Agency is not vicariously liable for the actions of

Marlene Mitchell, as she was not Plaintiff's supervisor, and the Agency was not negligent in not

preventing or correcting any alleged harassment.

Accordingly, judgment should be entered in favor of the Agency.

## FACTUAL BACKGROUND

The facts underlying this action are also provided in the sections below and in Defendant's

Statement of Material Undisputed Facts, which Defendant also incorporates by reference as though

fully set forth herein.

**A.**     **Plaintiff's Employment Under the Contract between the Agency and Ardent.**

Plaintiff received an offer letter from Ardent Eagle Solutions ("Ardent") and, in August

2017, Plaintiff was hired by Ardent as a Human Resource Assistant.  Ex. A (Pl. Tr.) at 18:25-19:6,

19:14-17, 25:14-16.  On July 18, 2017, Joe Albano, Program Execution at Ardent, recommended

Plaintiff for a position as a Human Resource Assistant to provide support under one of its contracts

with the Training Program, Office of Workforce Development and Performance Management

("Workforce Development Office"), Office of Human Resources Management ("HR Office") in

the Agency's Office of the Secretary, and Plaintiff was eventually placed as a contractor at the

Agency under contract number SS1301-16-CQ-004.[1]  Ex. B (Ardent Human Resource Assistant

candidate email); Ex. C (Contractor Questionnaire - Kram) at 75; Ex. A (Pl. Tr.) at 19:18-24; Ex.

D (Questionnaire - Hawthorne) at 171.  Plaintiff's role required specialized experience, education,

---

[1]       Under the Contract, the Human Resources/Staffing Assistant "[p]rocesse[d] HR actions
including payroll, benefits, and personnel actions for the purposes of employee actions, talent
acquisition support, onboarding support, presentations, training and related activities." Ex. E
(Contract) at 110-111. Ardent was responsible for ensuring that individuals provided to serve in
this role had a high school diploma or equivalent and "1 to 3 years' on-the-job experience with
personnel action coding a processing; documenting processes and procedure; and "experience in
a fast paced customer service environment." *Id.*

and training.  Ex. B (Ardent Human Resource Assistant candidate email); Ex. A (Pl. Tr.) at 21:22-22:1, 26:8-10.

The contract states that Ardent contractors are not intended to be joint employees of the Agency and Ardent, and it contained provisions to ensure that Ardent employees, including Plaintiff, were solely managed by Ardent.  Under the Contract between Ardent and the Agency, Ardent was responsible for a variety of tasks, including, among other things: (1) applying pay setting calculations; (2) making job offers to selectees; (3) resolving issues associated with hiring actions; (4) ensuring compliance with regulations and other program requirements; (5) determining correct pay categories; (6) conducting employee relations activities; (7) safeguarding all government equipment, information, and property provided for Ardent's use; (8) ensuring staff were properly trained and credentialed; (9) providing any special training, licensing, and certifications of personnel; (10) managing travel; (11) establishing and implementing security measures; (12) completing requests for Personal Identity Verification and Common Access Card badges for contractor access to government facilities; and (13) complying with all applicable employment laws and regulations.  Ex. E (Contract) at 93-94, 121, 127-45.  Ardent contractors were explicitly not to perform any "inherently governmental functions."  *Id.* at 119.

Additionally, Ardent employees who attended meetings, answered telephones, and worked in other situations where their contractor status was not obvious to third parties were "required to identify themselves as such to avoid creating an impression in the minds of members of the public that they are Government officials."  *Id.* at 95; *accord id.* at 121.  To that end, Ardent employees were required to "ensure that all documents or reports produced by Contractors are suitably marked as Contractor products or that Contractor participation is appropriately disclosed."  *Id.* at 95, 121.

As an Ardent employee, Plaintiff was a contractor with the Agency and not a federal employee, so Ardent was solely responsible for maintaining the employer/employee relationship with Plaintiff.  Ex. F (Phillips Tr.) at 56:9-15; Ex. C (Contractor Questions - Kram) at 75; Ex. A (Pl. Tr.) at 26:8-10; Ex. D (Questionnaire - Hawthorne) at 171.  Plaintiff was paid by Ardent, and Ardent managed Plaintiff's pay, time, and leave.  Ex. G (Jan. 8, 2018, email); Ex. H (Jan. 23, 2018, email) at 152, 155; Ex. I (Nov. 28, 2017, email thread); Ex. A (Pl. Tr.) at 26:11-16.  Ardent also handled Plaintiff's worker's compensation claim when she was allegedly injured due to a fall while at work in December 2017.  Ex. I (Nov. 28, 2017, email thread).  Plaintiff's resume also was labeled with Ardent's logo.  Ex. J (Pl.'s Resume).  Further, Plaintiff was not eligible for federal retirement benefits nor did the Agency give Plaintiff annual leave.  Ex C (Contractor Questions - Kram) at 75; Ex. D (Questionnaire - Hawthorne) at 172.

The entire Workforce Development Office, including the training program, was managed by Deputy Director of the Office of Workforce Development and Performance Management Tomeji Hawthorne.  Ex. K (Hawthorne Tr.) at 6:6-22, 7:1-2.  Hawthorne, however, did not supervise Plaintiff and had to defer to Ardent on any and all employment decisions regarding Plaintiff.  *Id.* at 10:2-12:9, 19:2-22, 26:2-27:17.  Plaintiff was primarily supervised by two Ardent employees, Project Manager Dr. Wesley Phillips and Joseph Albano (Phillips' supervisor).  Ex. A (Pl. Tr.) 24:16-22; Ex. F (Phillips Tr.) at 7:10-11, 8:5-8, 11:17-21, 30:5-17.  At the Agency, Plaintiff was assigned to work alongside federal employee Human Resource Specialist Anesia Robinson.  Ex. K (Hawthorne Tr.) at 18:14-20; Ex. L (Robinson Tr.) at 6:10-12:7.  Robinson was neither Plaintiff's supervisor, nor did she hold a management position.  Ex. K (Hawthorne Tr.) at 10:13-15; Ex. L (Robinson Tr.) at 13:18-19.  The training program staff were, amongst other things, responsible for the administrative tasks relating to in-person and online training for

Commerce staff on a variety of subjects, including new supervisory training, retirement training, and other mandatory and voluntary trainings.  Ex. L (Robinson Tr.) at 6:18-7:22, 46:21-48:8.

Also, the training program staff maintained the data-entry portion of the Agency's training database, the Commerce Learning Center.  *Id.* at 38:10-14.  Robinson handled customer service, worked with outside vendors, and approved or denied training requests, while Plaintiff processed training request forms, maintained the Agency's purchase order number spreadsheet, reserved rooms for training, managed training attendance sheets, and uploaded attendance data into Commerce Learning Center.  *Id.* at 6:18-7:22, 8:22-10:21, 15:9-16:4, 46:21; Ex. A (Pl.'s Tr.) at 19:25-20:21.

**B.**     **Plaintiff's Performance Under the Contract Between the Agency and Ardent**

On several occasions between October and December 2017, Robinson informed Bell that Bell (1) had made mistakes in reserving appropriate conference rooms for training programs;[2] (2) was improperly maintaining Agency databases, Ex. M (Nov. 29 - Dec. 5, 2017); (3) was not making sufficient progress on clearing a backlog of training data entry for the Commerce Learning Center, Ex. P (Nov. - Dec. 2017); (4) was improperly processing training request forms, Ex. Q (Nov. 28, 2017 – Jan. 6, 2018); (5) was making mistakes while filing training request forms, Ex. R (Sep. 2017 – Dec. 2017); (6) was taking too long on sign-in sheets for trainings, Ex. S (Nov. 30 - Dec. 7, 2017); (7) was making mistakes with meeting invitation settings, Ex. T (Jan. 8, 2018); and (8) and was providing incorrect information to employees relating to training locations and dates, Ex. U (Dec. 2017 – Jan. 2018). Additionally, when certifying to Ardent the number of hours

---

[2]     For example, concerning a December 6-7, 2017, training program put on by an outside trainer from HCI, (Ex. M (Nov. 29 - Dec. 5, 2017); a retirement seminar (Ex. N (January 23-24)); and a forthcoming February 12-16, 2018, New Supervisory training program (Ex. O (Dec. 1 - 7, 2017)). *See also* Ex. L (Robinson Tr.) at 20:10-13, 29:7-30:18.

Plaintiff claimed to have worked on the contract, Hawthorne discovered that Plaintiff made errors in reporting her time to Ardent.  Ex. V (Nov. 21, 2017); Ex. W (Dec. 14, 2017); Ex. X  (Jan. 4, 2018).  Robinson explained that she sat down with Plaintiff and went over these issues to try to rectify the problems, but the problems continued.  Ex. L (Robinson Tr.) at 106:8-16.

Robinson noted that Plaintiff "just wasn't performing as sharp as she had when she first started working in the office."  *Id.* at 16:12-17:17.  Robinson stated that, "out of concern, I questioned . . . was everything fine with her, and she said yes.  So[,] I left it alone."  *Id.* at 16:21-17:3.  Eventually, Robinson spoke to Hawthorne "to let her know that [Robinson] was worried about [Plaintiff] because [Plaintiff] was just not performing the same.  [Plaintiff] just was not herself.  And [Robinson] wanted to know if [Hawthorne] knew what was going on or did [Hawthorne] notice a change as well."  *Id.* at 21:8-13.  Overall, Robinson noted that "[t]here were things that had slipped through the cracks, and since the training program belonged to [Robinson], [Hawthorne] came to [Robinson] to ask [Robinson] what was going on" when Robinson returned from her holiday leave.  *Id.* at 20:5-7.

Phillips explained that until the Agency made him aware of the performance deficiencies in January 2018, he had not heard anything negative about Plaintiff and assumed she was "an awesome employee."  Ex. F (Phillips Tr.) at 33:2-21.  Although Plaintiff mentioned that she felt like she was not able to concentrate on her assignments, she was unaware of her performance deficiencies and instead relied on Phillips' assessment of her performance under the contract and thought she was satisfactorily performing her duties and responsibilities.  Ex. A (Pl. Tr.) at 103:3-104:10.[3]

---

[3]      Prior to being placed at the agency, Plaintiff noted that she "dealt with anxiousness, but I never knew that it was anxiety," and she had never received any treatment from a medical provider regarding her mental health.  Ex. A (Pl. Tr.) at 131, 134-35.  During December 2017, and

**C.**   **Plaintiff's Interactions with Non-Supervisory Agency Employees.**

On December 21, 2017, Plaintiff and Human Resources Assistant Margaline ("Marlene") Mitchell, a non-supervisory agency employee in the Employee and Labor Relation Division, had a disagreement. Ex. Y (Dec. 21, 2017, email). Plaintiff attempted to assist Marlene's co-worker— another agency employee, Liza—with a technical issue involving her docking station that was malfunctioning. Ex. Z (Mitchell Tr.) at 15:21-16:4; Ex. A (Pl. Tr.) at 80:13-81:9. Marlene suggested that Liza redock her station, while Plaintiff suggested that Liza go to the IT office. Ex. Z (Mitchell Tr.) at 16:2-9. Marlene advised Plaintiff that IT prefers employees to submit a ticket through the IT portal before physically bringing any equipment to them. *Id.* at 16:2-17:5. Marlene noticed that Plaintiff "was getting aggravated," so she suggested that they talk the issue out in a separate space. *Id.* at 17:6-17:7.

Plaintiff on the other hand testified that Marlene surrounded her desk with other women and Marlene said they were going to fight. Ex. A (Pl. Tr.) at 82:13-19, 84:2-7, 85:5-86:6; Ex. Y (Dec. 21, 2017, email). Plaintiff initially agreed to go to another space, but eventually "turned around and said, 'I'm not going'" and instead Plaintiff called Hawthorne. Ex. Z (Mitchell Tr.) at 17:8-15; Ex. A (Pl. Tr.) at. 85:5-86:6. Hawthorne in turn called Marlene and requested her side of the story. Ex. Z (Mitchell Tr.) at 17:16-18. Marlene explained her side of the story and, when she exited the conference room, heard Plaintiff mumble "[i]t's your world." *Id.* at 17:19-21. Marlene grabbed her purse and went to lunch. *Id.* at 18:1-3. Marlene estimated that the entire interaction lasted "less than 10 minutes." *Id.* at 14:4-7. Marlene stated that "[it was] a petty incident that was blown way out of proportion. Like I said, me and [Plaintiff] never had any incident, no name calling, no nothing. I knew nothing about her personally. We always had pleasantries. That's

---

throughout the year of 2018, Plaintiff was hospitalized for mental health reasons. *Id.* at 126-132.

why I am very shocked at this [deposition proceeding]." *Id.* at 14:4-7, 49:2-7.

After the incident, on December 21, 2017, Plaintiff emailed the Director of the Office of Workforce Development and Performance Management, Angela Ameen, and Hawthorne, stating that "I need to urgently request Jiji to move my seat.  I had a situation with Marlene that's escalating.  So before she humiliates herself or me I am requesting to move."  Ex. Y (Dec. 21, 2017, Email).  Plaintiff explained that while she was doing a favor for Liza, Marlene raised her voice in response to Plaintiff's explanation regarding IT protocol, "challenged [Plaintiff] to follow her outside the office so she could let [Plaintiff] know ????????"  Plaintiff then alleged that Marlene followed Plaintiff around the office, said "she [was] done with" Plaintiff, and then gathered several other employees together to "give [Plaintiff] a hard time." *Id.*  Plaintiff explained that the disagreement began regarding IT protocol and that "Marlene wants this BIG fight so it's very disgraceful and unladylike the way she handled herself . . . going to IT with this big presentation." *Id.*

On December 22, 2017, Plaintiff emailed her personal email with a further synopsis of her interaction with Marlene:

> What happened was that Liza was having computer issues, I asked her did she want me to call IT, she said yes, so I did. While calling IT several times and NO answer, I told Liza that I (Robin) would walk down toI T sometimes when I didn't get an answer, Marlene interrupts and says :You not supposed to go down there, you got get a ticket first and wait for them ???????. I said ok but my experience is if I preparing for training and I call IT and get no answer, I will walk down there and they would help me with no problem. OMG then Marlene begins raising her voice "WELL THAT'S NOT RIGHT???????. I turned around put my earphones in and started working. Because I tuned her out, she goes from 1-100 in seconds and invades my space.

*See* Ex. AA (Dec. 22, 2017, Email) (errors in original).

On December 26, 2017, Plaintiff sent an email to Ameen and Hawthorne and stated "I am officially filing a complaint against co-worker Marlene Mitchell on Thursday, December 21,

2017@ approximately 12:05 pm. I encountered a very serious situation with a co-worker Marlene." Ex. BB (Dec. 26, 2017, Email).  Plaintiff re-explained the interaction with Marlene. *Id.*

Hawthorne investigated Plaintiff's complaint regarding Marlene's conduct and their December 21, 2017 disagreement.  Ex. K (Hawthorne Tr.) at 34:1-36:8, 40:12-43:1, 43:16-45:15. Hawthorne requested that Marlene provide a written statement explaining her side of the incident, which Marlene did.  *Id.* at 42:17-43:1; Ex. CC (Marlene Statement).  Hawthorne also spoke to Liza about the December 21, 2017 incident between Plaintiff and Mitchell.  Ex. K (Hawthorne Tr.) at 40:19-21.  Hawthorne concluded that "there were differing statements" and employees needed to be mindful and cognizant of their behavior in the workplace.  *Id.* at 41:2-4.  Hawthorne further concluded that the issue fundamentally pertained to misunderstanding of appropriate IT protocol and Plaintiff was not "in any type of situation in which she should be fearful or that there were raised voices, and that the entire incident could have been avoided." *Id.* at 41:8-42:5.  Hawthorne found that neither Marlene nor Plaintiff was solely at fault for the interaction and advised both to behave professionally in the workplace.  *Id.* at 44:10-14.

Hawthorne explained that, in her experience as a supervisor and the Agency head in charge of investigating and reviewing allegations of harassment prohibited by law, Plaintiff's communications with her and Ameen did not state that there was a protected basis that motivated the incident, and it did not constitute an EEO claim or one covered by the Agency's internal administrative orders.  *Id.* at 37:2-39:18, 62:16-64:10.

Plaintiff testified that after the December 21, 2017, incident, Marlene's behavior towards her had gotten worst.  Ex. A (Pl. Tr.) at 88:1-90:12.  Plaintiff did not subsequently communicate with Hawthorne, Ameen, Robinson, or Marlene about her December emails, nor did she make any

other complaints about Marlene after the December 21, 2017 incident.  Ex. K (Hawthorne Tr.) at 43:16-21; Ex. A (Pl. Tr.) at 111:7-11.  Plaintiff further testified that no other employees or supervisors harassed her.  Ex. A (Pl. Tr.) at 110:19-23, 112:4-12.  Further, prior to December 21, 2017, Hawthorne had not received any complaints from Plaintiff regarding Marlene's behavior. Ex. K (Hawthorne Tr.) at 64:19-65:2.

On January 10, 2018, Plaintiff asked Hawthorne to temporarily move to an office because she thought that would be safer option.  Ex. DD (Jan. 10, 2018, email); Ex. A (Pl. Tr.) at 76:11-21.  Hawthorne told Plaintiff that she was free to take her laptop to any open space huddle rooms whenever she wanted.  Ex. DD (Jan. 10, 2018, email); Ex. A (Pl. Tr.) at 76:11-21

**D.** **Plaintiff's Removal from the Contract Between Ardent and the Agency.**

On January 9, 2018, Hawthorne found that Plaintiff again had incorrectly recorded her timesheet with Ardent.  Ex. EE (Jan. 9, 2018, email).  Hawthorne notified Ardent of the discrepancy in claimed hours versus Plaintiff's arrival/departure times, and informed Ardent that because Plaintiff was taking a "mental health day" she would follow up with Plaintiff the next day. *Id.*

On January 10, 2018, Hawthorne had a discussion with Robinson about the hours that Plaintiff was working—versus the hours she claimed to be working—and their impact on the operations of the training program.  Ex. L (Robinson Tr.) at 19:9-21:22; 26:18-30:18; Ex. FF (Jan. 11, 2018, deficiency email).  During this discussion, Robinson raised her concerns about Plaintiff's declining performance, and Hawthorne requested Robinson send her written documentation of the performance deficiencies she had noted and observed in Plaintiff's work product.  Ex. L (Robinson Tr.) at 19:9-21:22; 26:18-30:18.  Hawthorne had a conversation with Phillips after the discussion with Robinson, and scheduled a meeting for her, Robinson, Phillips, and Plaintiff to discuss the

training program and expectations concerning it.   Ex. K (Hawthorne Tr.) at 26:2-22; Ex. LL (Training Meeting Invite).   Phillips testified that while Hawthorne contacted him, he did not have authority to make employment decisions on behalf of Ardent, but his supervisors did.   Ex. F (Phillips Tr.) at 11:8-13:22.   Phillips explained that managers often contacted him because "they saw [him] all the time.  If they contacted [him] directly, [he] contacted Joe Albano or Gene."[4]  *Id.* at 11:8-13:22, 14:1-6.   During this meeting, Albano told Phillips that Ardent would be terminating Plaintiff on January 11 because Hawthorne no longer wanted to keep her on the contract due to her unsatisfactory performance.  *Id.* at 33:2-33:17, 34:4-35:19; Ex. K (Hawthorne Tr.) at 26:22-27:11.

On January 11, 2018, Robinson emailed Hawthorne a list of seven areas of deficiencies in Plaintiff's fulfillment of Ardent's service contract with the Agency:  scheduling conference rooms, helping clear the data entry backlog, data entry errors, delays in data entry, delays in processing training request forms, sending emails to clients containing incorrect information, and errors with purchasing order numbers.  Ex. FF (Jan. 11, 2018, deficiency email).   Hawthorne forwarded the email to Shane "Anthony" Kram, the Agency's Contracting Officer for the Ardent contract.   Ex. GG (Jan. 11, 2018, email).   In this email, Hawthorne explained that she learned of Plaintiff's performance deficiencies, spoke with Philips about Plaintiff's performance, and noted that Plaintiff had a slip-and-fall in early December and a had "verbal altercation . . . in late December."  *Id.* Kram then forwarded Hawthorne's email to Plaintiff's supervisors and Ardent's point of contact for the Agency.   Ex. HH (Email from Kram to Ardent).   Kram stated, "[i]t has become apparent that the individual will not meet a satisfactory level of performance and [Ardent] is requested to remove the person from performance under the contract today and replace with an individual who

---

[4]      Gene Steffanetta is the Contracts Manager.  Ex. E (Contract) at 132.

can meet performance standards at the earliest time possible." *Id.*

On January 11, 2018, Plaintiff met with Phillips and Albano, who informed her that Ardent was removing her from the Agency Contract. Ex. HH (Email from Kram to Ardent); Ex. F (Phillips Tr.) at 23:3-26:11. While Hawthorne did not recall being at the meeting, Phillips recalled that Hawthorne also was present but did not speak. Ex. K (Hawthorne Tr.) at 47:1-49:11; Ex. F (Phillips Tr.) at 23:2-26:211. Phillips, Hawthorne, Kram, and the contract between Ardent and the Agency all explained that Hawthorne lacked the authority to make any employment decision regarding Plaintiff's employment, and Hawthorne merely provided Ardent information for it to make its own employment decisions. Ex. F (Phillips Tr.) at 34:4-37:20, 44:12-17, 56:16-57:13, 59:8-19; Ex. K (Hawthorne Tr.) at 9:9-12:11, 26:2-27:21, 62:2-9; Ex. C (Contractor Questionnaire - Kram) at 75-77; Ex. E (Contract) at 92-95, 119, 127, 132. After the meeting, Plaintiff and Phillips collected Plaintiff's personal items, her government assets, and security badge, and Plaintiff left the building. Ex. F (Phillips Tr.) at 36:1-14.

**E.**   **Plaintiff's EEO Complaint and Administrative Proceeding**

On January 23, 2018, Plaintiff initiated contact with the Agency's Equal Employment Opportunity ("EEO") Office, alleging that Department of Commerce employees had retaliated against her. Ex. II (Counseling Report) at 29-30.

On March 15, 2018, Plaintiff filed a formal EEO complaint with the Agency's EEO Office, on which she only checked the box for retaliation. Ex. JJ (Pl.'s EEO Compl. and Supporting Docs.) at 2. Plaintiff solely claimed that she was retaliated against for reporting allegations of harassment by the Agency employees, she was subjected to further harassment, and she was eventually terminated from her position with Ardent. *Id.* at 2-28. In her narrative statement and supporting documentation, Plaintiff only claimed that the Agency had retaliated against her for raising issues

12

of non-specific harassment by an Agency employee. *Id.* at 2-22, 26-28. Plaintiff's allegation in the administrative process was solely that "I, Robin Bell, was falsely terminated because I filed a harassment complainant against [Marlene]." *Id.* at 26.

On March 29, 2018, the Agency issued a final agency decision and dismissed Plaintiff's complaint for failing to state a claim upon which relief could be granted. Ex. KK (FAD) at 6. The Agency determined that Plaintiff complained that she was subjected to harassment but failed to identify a basis of discrimination covered by Title VII, and her claims of retaliation were not covered by Title VII. *Id.* at 4-6.

## PROCEDURAL BACKGROUND

After receiving OCR's final decision, Plaintiff, initially proceeding pro se, filed a petition for review in the U.S. Court of Appeals for the Federal Circuit on May 8, 2018. ECF No. 1, Compl. The Federal Circuit transferred the case to the U.S. District Court for the District of Maryland on September 26, 2018. ECF No. 7, August 1, 2018, Order. That district court in turn transferred the case to this Court on October 16, 2019. ECF No. 21, October 4, 2019, Order. Pro bono counsel entered an appearance on behalf of Plaintiff on March 7, 2020. ECF No. 24. Plaintiff thereafter moved for leave to file her First Amended Complaint, ECF No. 29-1, which was deemed filed on May 26, 2020.

Thereafter, Defendant moved (i) to dismiss Counts I, II, V, VI, and VII of the First Amended Complaint pursuant to Rule 12(b)(6) or, alternatively, for summary judgment on those counts pursuant to Rule 56, and (ii) to dismiss Counts III and IV pursuant to Rules 12(b)(1) and 12(b)(6). ECF No. 30, Def.'s Mot. Plaintiff subsequently filed an opposition (ECF No. 31, Pl.'s Opp.) and a separate motion for discovery (ECF No. 32, Pl.'s Mot.). The Court issued a decision on March 22, 2021. *See* ECF No. 39, Mem. Op. The Court granted Defendant's motion as to

Counts III, IV, V, VI, and VII, and denied that motion as to Counts I and II (Retaliatory Discharge & Retaliatory Hostile Work Environment).  *Id.* at 20.  The Court further granted Plaintiff's motion for discovery as to Counts I and II only, ordering that discovery should only proceed on the "harassment/hostile work environment," "retaliation," "pretext," and "joint-employment" matters as they relate to Counts I and II, specifically and solely for retaliatory discharge and retaliatory hostile work environment.  *Id.*

## **LEGAL STANDARD**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the substantive outcome of the litigation.  *Anderson*, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Under Rule 56, the moving party has the initial burden of demonstrating the absence of a genuine dispute as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party meets its burden, the nonmoving party must, to defeat the motion, designate "specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (citation omitted).  Though courts must view this evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23-24 (D.C. Cir. 2013), the nonmoving party must show more than "[t]he mere existence of a scintilla of evidence in support of" her position—there "must be evidence on which the jury could reasonably find for" the non-movant.  *Anderson*, 477 U.S. at 252.

14

Furthermore, the nonmoving party "may not rest upon mere allegation or denials of [her] pleading but must present affirmative evidence showing a genuine issue for trial." *Laningham v. Dep't of Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal citation and quotation marks omitted).

## ARGUMENT

Plaintiff's claim of retaliation under Title VII fails as a matter of law.  Plaintiff was a contractor and not a federal employee, nor was she a joint employee with the Agency; therefore, she may not bring a Title VII claim against Defendant.  Even if Plaintiff could establish a joint employment relationship with the Agency, judgment should be entered in favor of the Agency because she cannot establish a *prima facie* case of retaliation.  Further, even if Plaintiff might establish a *prima facie* case of retaliation, the Agency has a legitimate, non-retaliatory, non-pretextual reason for the decision to remove Plaintiff from the contract between the Agency and Ardent:  her poor performance under the contract.  Lastly, Plaintiff also cannot establish a *prima facie* case of a retaliatory hostile work environment, nor can she establish that the Agency is vicariously liable for the actions of a non-supervisory employee.

## I.    Plaintiff's Complaint Should Be Dismissed Because Plaintiff Was a Contractor, Not A Federal Employee, and Thus May Not Sue the Government Under Title VII.

The United States has not waived sovereign immunity for Title VII actions brought by individuals who are not federal employees.  42 U.S.C. § 2000e-16.  Title VII proscribes discrimination against federal employees based upon race, color, religion, sex, or national origin. *Id.*  Title VII also prohibits the federal government from retaliating against its employees for exercising their rights under the statute.  *Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006).  But the federal sector provisions of Title VII "cover only those individuals in a direct employment relationship with a government employer." *Spirides v. Reinhardt*, 613 F.2d 826, 829

(D.C. Cir. 1979).  Thus, "[i]ndividuals who are independent contractors or those not directly employed by such an employer are unprotected."  *Id.*

In determining whether a Plaintiff is an "employee" of a federal agency, the Court relies heavily on standards developed under the common law of agency, as applied in the Title VII context.  The statute sets forth only a nominal definition of employee—"an individual employed by an employer."  42 U.S.C. § 2000e(f).  Observing that this definition "is completely circular and explains nothing," the Supreme Court has encouraged courts to use "traditional agency law principles" to answer this question.  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992).

This Circuit has applied two similar but distinct common-law agency tests to determine whether a person is an "employee."  *See Simms v. District of Columbia*, 587 F. Supp. 2d 269, 273-74 (D.D.C. 2008).  The first test is that found in *Spirides*, 613 F.2d at 826, and was developed to determine whether an individual who provided services directly to the government as an independent contractor, rather than as an employee of a government contracting firm, was an "employee" within the meaning of Title VII.  *Id.* at 830.  To determine whether an individual is an employee or independent contractor, courts conduct an "analysis of the 'economic realities' of the work relationship."  *Id.* at 831.  The "most important factor to review" under *Spirides* is "the extent of the employer's right to control the 'means and manner' of the worker's performance[.]"  *Id.*  In addition, the Court balances eleven other non-exhaustive factors:

> (1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation; (3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the worker accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the

intention of the parties.

*Id.* at 832.   "Consideration of all of the circumstances surrounding the work relationship is essential, and no one factor is determinative." *Id.* at 831.  *Spirides* has enjoyed broad acceptance in the Title VII context.  *See, e.g., Bryant v. Orkand Corp.*, 407 F. Supp. 2d 29, 33 (D.D.C. 2005); *see also Zhengxing v. Nathanson*, 215 F. Supp. 2d 114, 117 (D.D.C. 2002).

The second test is found in *NLRB v. Browning-Ferris Industries of Pennsylvania, Inc.*, 691 F.2d 1117 (3d Cir. 1982).  The *Browning-Ferris* test addresses "joint employer" situations like this one in which the plaintiff may be an "employee" of two organizations at once.  *Id.* at 1122-23.  The *Browning–Ferris* test determines an individual's status by whether the defendant "retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *Id.* at 1123.  Applied to this case, Ardent and the Agency would be "joint employers" if "they share or co-determine those matters governing the essential terms and conditions of employment." *Id.*  Although the *Browning-Ferris* standard was developed in the context of resolving employment law issues under the National Labor Relations Act, it has subsequently been applied in Title VII cases.  *E.g.*, *Int'l Union v. Clark*, Civ. A. No. 02-1484, 2006 WL 2598046, at *6 (D.D.C. 2006); *Harris v. Att'y Gen.*, 657 F. Supp. 2d 1 (D.D.C. 2009).

Because Plaintiff claims to be a joint employee of both Ardent and the Agency, *Browing-Ferris* more directly applies, but the Agency will show that under either test, Plaintiff was neither a federal employee nor did she enjoy joint employment with the Agency.

Here, weighing the *Spirides* factors supports a finding that Plaintiff was not a federal employee. The second, fifth, sixth, seventh, ninth, tenth, and eleventh *Spirides* factors—*i.e.*, the skill required in the particular occupation, method of payment, the manner in which the work

relationship is terminated, whether annual leave is afforded, whether the worker accumulates retirement benefits, whether the "employer" pays social security taxes, and the intention of the parties – all weigh in favor of finding that Plaintiff was a contractor, not a federal employee. Specifically, Plaintiff received an offer letter from Ardent, was hired by Ardent as a Human Resource Assistant, and her resume was labeled with Ardent's logo. Ex. A (Pl. Tr.) at 18:25-19:6, 19:14-19:17, 25:14-; Ex. J (Pl.'s Resume). Plaintiff was merely referred to the Agency under the contract between Ardent and the Agency. Ex. B (Ardent Human Resource Assistant candidate email); Ex. C (Contractor Questionnaire - Kram) at 75; Ex. A (Pl. Tr.) at 19:18-24; Ex. D (Questionnaire - Hawthorne) at 171.

Plaintiff's role required specialized experience, education, and training. Ex. B (Ardent Human Resource Assistant candidate email); Ex. A (Pl. Tr.) at 21:22-22:1, 26:8-10. Also, Plaintiff was required to identify herself as a contractor in communications, including in her email address line. Ex. E (Contract) at 95, 121; *see also, e.g.*, Ex. DD (Jan. 10, 2018, email) ("From: Bell, Robin (Contractor)"). Further, Plaintiff was paid by Ardent, was not eligible for federal retirement benefits, did not receive annual leave from the Agency, and Ardent managed Plaintiff's pay, time, and leave. Ex. G (Jan. 8, 2018, email); Ex. H (Jan. 23, 2018, email) at 152, 155; Ex. I (Nov. 28, 2017, email thread); Ex. A (Pl. Tr.) at 26:11-16; Ex. C (Contractor Questions - Kram) at 75; Ex. D (Questionnaire - Hawthorne) at 172. Plaintiff testified that she chose her hours and would only provide the Agency notice when she was going to be late or not coming in. Ex. A (Pl. Tr.) at 121:17-122:21, 124:2-9. The Agency only confirmed with Ardent that Plaintiff worked the hours she claimed. *Id.*; *see also* Ex. K (Hawthorne Tr.) at 9:14-10:1. Thus, a majority of the factors under *Spirides* weigh in favor of Plaintiff not being a federal employee.

The *Browning-Ferris* analysis also weighs in favor of finding that there was no "joint

employment." Based on the totality of the circumstances, in addition to the reasons discussed above, the Agency clearly did not have significant control over the terms and conditions of Plaintiff's employment because Ardent was solely responsible for maintaining the employer/ employee relationship with Plaintiff. Ex. F (Phillips Tr.) at 56:9-15; Ex C (Contractor Questions - Kram) at 75; Ex. A (Pl. Tr.) at 26:8-10; Ex. D (Questionnaire - Hawthorne) at 171. Ardent handled Plaintiff's worker's compensation claim, when she allegedly was injured due to a slip and fall. Ex. I (Nov. 28, 2017, email thread). Plaintiff was primarily supervised by two Ardent employees, Phillips and Albano, and Hawthorne deferred to Ardent on any and all employment decisions regarding Plaintiff. Ex. A (Pl. Tr.) 24:16-22; Ex. F (Phillips Tr.) at 7:10-11, 8:5-8, 11:17- 21, 30:5-17. The only control the Agency exerted over Ardent staff was providing Plaintiff with access to government property and rejecting or accepting Ardent staff's work products, deliverables, and performance of the Contract. Ex. E (Contract) at 120.

Further, the Agency did not terminate Plaintiff's employment with Ardent, but only had authority to request Ardent to remove the Plaintiff from performance under the contract between Ardent and the Agency, that is, reject the delivery of Plaintiff's work products, deliverables, and performance of the contract. Ex. F (Phillips Tr.) at 34:4-37:20, 56:16-57:13, 59:8-19; Ex. K (Hawthorne Tr.) at 9:9-12:11, 26:2-27:21, 62:2-9; Ex. HH (Email from Kram to Ardent). Finally, based on the totality of the circumstances, and the contract between Ardent and the Agency, plainly the intentions of Ardent and the Agency were that Plaintiff was a contractor employed by Ardent and was neither a federal employee nor jointly employed with the Agency.

For these reasons, under either the *Spirides* or the *Browning-Ferris* test, Plaintiff was only a contractor and is not covered by Title VII vis-a-vis the Agency. Accordingly, Plaintiff cannot recover under Title VII against the Government.

## II.    Alternatively, Plaintiff Cannot Establish a Claim for Retaliatory Discharge (Count I).

### A.    Legal Standard Regarding Retaliation Claims.

When assessing a retaliation claim, the Court cannot "'second-guess an employer's personnel decision absent a demonstrably discriminatory motive.'"  *McGrath v. Clinton*, 666 F.3d 1377, 1384-85 (D.C. Cir. 2012) (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1182 (D.C. Cir. 1996)).  Like discrimination claims, retaliation claims are subject to the burden-shifting framework set out in *McDonnell Douglas*.  Under this regime, a plaintiff must first establish a *prima facie* case of retaliation by showing: (1) that she engaged in protected activity; (2) that the employer subjected her to a materially adverse action; and (3) that a but-for causal connection existed between the protected activity and the materially adverse action.  *Univ. of Tex. S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 356-60 (2013); *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-68 (2006); *Rochon*, 438 F.3d at 1219-20; *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985).

First, Plaintiff must have engaged in protected activity.  An individual engages in protected activity when she makes "informal, as well as formal, complaints of discrimination." *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007).  This includes "oppos[ing] any practice made an unlawful employment practice by this subchapter[,]" or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

Second, the plaintiff must show that she was subjected to a materially adverse action, which is one that would have "dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 68; *see also Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013).  Typically, a materially adverse action involves "a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Bridgeforth*, 721 F.3d at 663 (citations omitted).

Third, the plaintiff must show that the protected activity was the but-for cause of the materially adverse action. *Nassar*, 570 U.S. at 360. Here, a plaintiff must show that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id.*; *see also Rattigan v. Holder*, 982 F. Supp. 2d 69, 81 (D.D.C. 2013) ("Under this standard, it is not sufficient for plaintiff to demonstrate that a reasonable jury could find that retaliatory animus by plaintiff's supervisor was *a* cause for the referral. Rather, plaintiff must demonstrate that there is a genuine issue of material fact as to whether retaliatory animus was the cause for the referral.").

A plaintiff bears the burden of satisfying all three prongs of a retaliation claim. If a plaintiff succeeds in satisfying her burden, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

As with discrimination claims, however, once an employer sets forth a legitimate, nonretaliatory reason for the challenged personnel action, the district court need not examine in depth Plaintiff's *prima facie* case of discrimination. *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, the question becomes whether "the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee[.]" *Id.*; *see also Jones v. Bernanke*, 557 F.3d 670, 678 (D.C. Cir. 2009).

*Brady* does not, however, render obsolete Plaintiff's obligation to establish the essential elements of her claim.  That is because what courts "often describe[ ] as the elements that a plaintiff must show to establish a 'prima facie' case of retaliation … are also the elements that a plaintiff must ultimately prove in order to win [her] case."  *McGrath*, 666 F.3d at 1380 n.3.  A plaintiff must still have suffered an adverse employment action that was the result of intentional retaliation. *Gilbert v. Napolitano*, 670 F.3d 258, 262 (D.C. Cir. 2012); *Taylor v. Mills*, 892 F. Supp. 2d 124, 140 (D.D.C. 2012).  In other words, even where a court finds questions of fact with respect to an employer's proffered legitimate, non-retaliatory basis for the employment action, summary judgment is still appropriate if the plaintiff failed to provide evidence of an adverse action, protected activity, and causation.  *See Gilbert*, 670 F.3d at 262; *McGrath*, 666 F.3d at 1385.

**B.    Plaintiff's Retaliation Claim Must Be Dismissed Because Plaintiff Can Not Demonstrate That She Participated in A Statutorily Protected Activity.**

Plaintiff's retaliation claim fails because Plaintiff has not participated in any "statutorily protected activity."  Participation in an EEO process is specifically understood to refer to raising a claim, testifying, assisting, or participating in any manner in an investigation, proceeding, or hearing under the EEO laws, but any such participation is very broadly protected.   EEOC Enforcement Guidance on Retaliation and Related Issues (2016), https://www.eeoc.gov/laws/ guidance/enforcement-guidance-retaliation-and-related-issues.   Title VII "both prohibits employers from engaging in employment practices that discriminate on the basis of race, color, religion, sex, or national origin, *see* 42 U.S.C. § 2000e–2(a), and bars them from retaliating against an employee because [she] has opposed any [such] practice, *id.* § 2000e–3(a)."  *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015).  The Courts have interpreted this phrase to extend to where the employee "reasonably and in good faith believed [the practice] was unlawful under the statute."  *Grosdidier*, 709 F.3d at 24 (citing *McGrath*, 666 F.3d at 1380).

But if the practice the employee opposed is not one that could reasonably and in good faith be regarded as unlawful under Title VII, this element is not satisfied. *McGrath*, 666 F.3d at 1380. Generalized complaints about working conditions do not constitute "opposition" to discriminatory employment practices for the purpose of establishing reprisal unless the employee produces evidence from which to find that a reasonable employee could have believed it was so "extreme" as to alter the conditions of her employment. *George v. Leavitt*, 407 F.3d 405, 416 (D.C. Cir. 2005). Because a plaintiff must have engaged in the protected activity of bringing or threatening to bring a discrimination claim, or supporting such a claim, to state a claim for retaliation, "not every complaint garners its author protection under Title VII." *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006).

Plaintiff alleges that she was retaliated against when the Agency removed her from the contract because of her complaints about harassment by her colleagues. *See generally* Am. Compl. ¶¶ 6-8. The evidence, however, does not support Plaintiff's allegation that she opposed an employment practice that she could reasonably have regarded as unlawful under Title VII prior to January 23, 2018, the day Plaintiff made her initial contact with an EEO counselor. Reviewing the evidence in the light most favorable to Plaintiff, the evidence demonstrates that the only "opposition" before January 23, 2018, is the complaint involving one incident between Plaintiff and Marlene Mitchell, a non-supervisory employee, regarding a misunderstanding of IT protocol. Plaintiff's description of the incident in her December 21, 22, and 26 emails and memoranda do not reference any characteristic or class protected by Title VII and other non-discriminatory statutes. Ex. JJ (Pl.'s EEO Compl. and Supporting Docs.) at 2, 10, 12-14, 15-16, 26-28. Further, Plaintiff's EEO Complaint was devoid of any details involving any characteristic or class protected by Title VII and other non-discriminatory statutes, nor did Plaintiff check any other box besides

"retaliation."  *Id.*  Further, Plaintiff admitted that she made no other complaints after December 21, 2017, Ex. A (Pl. Tr.) at 111:7-11, nor is there any evidence that any complaints were made to the Agency's management prior to December 21, 2017.  In fact, Hawthorne testified that she did not receive any complaints from Plaintiff regarding Marlene's behavior before December 21, 2017.  Ex. K (Hawthorne Tr.) at 64:19-65:2.  Plaintiff also admitted that no other employees or supervisors harassed her.  Ex. A (Pl. Tr.) at 110:19-23, 112:4-12.

An employee simply "opposing" a disagreement with another co-worker over an IT issue is neither bringing nor threatening nor supporting a discrimination claim and is not opposing any policy or practice unlawful under Title VII—and thus is not a statutorily protected activity.  *See* 42 U.S.C. §§ 2000e–2 (a); *see also id.* § 2000e–3(a); *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727-28 (7th Cir. 2003) (complaining about being "picked on" does not constitute protected activity, even if the employee honestly believes she is the subject of sex discrimination); *Broderick*, 437 F.3d at 1232 (in assessing whether plaintiff's memo complaining about her current job status, which memo was sent to her supervisors and the EEO office, qualifies as protected activity, the court stated that "[w]hile no 'magic words' are required, the complaint must in some way allege unlawful discrimination, not just frustrated ambition.").

Thus, because Plaintiff only alleges that she opposed "harassment" involving one incident involving a misunderstanding with a non-supervisory employee about the appropriate IT protocol and it was not based on an unlawful employment practice, her retaliation claim fails.  *See Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 77 (D.D.C. 2007) (under Title VII, the only "protected activity" that may give rise to a retaliation claim is opposition to an "unlawful employment practice" or participation "in a discrimination charge, investigation, or proceeding."); *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998) (holding that "there was no evidence

to support a finding that [the employer acted] in retaliation for opposing Title VII-prohibited discrimination" when plaintiff merely made general working complaints); *cf. Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998) (Title VII must not "expand[] into a general civility code").

### C.   Plaintiff Cannot Establish a Causal Connection Between Her EEO Activity and Removal from the Contract.

To the extent that Court finds the only statutorily protected activity in this case is Plaintiff's contact with the EEO counselor on January 23, 2018, her retaliation claim fails because Plaintiff is unable to demonstrate a connection between her EEO activity and her removal from the contract between Ardent and the Agency.

If a decisionmaker was already contemplating an employment action before learning of the employee's protected activity, that activity cannot form the basis of a retaliation claim. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned [employment actions] upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."). Plaintiff was removed from the contract on January 11, 2018, but Plaintiff's initial contact with EEO concerning her removal was on January 23, 2018, and she filed her formal EEO Complaint in March 2018. Ex. JJ (Pl.'s EEO Compl. and Supporting Docs.) at 2; Ex. II (Counseling Report) at 29-30. Because Plaintiff's removal from the contract predated her protected activity, her retaliatory removal claim fails on this basis. *See Carter v. Greenspan*, 304 F. Supp. 2d 13, 30 (D.D.C. 2004) (because supervisors' dissatisfaction with plaintiff's performance and the intent to terminate him predated protected activity, retaliatory discharge claim was illogical and dismissed); *Horne v. Reznick, Fedder & Silverman*, 154 F. App'x 361, 364 (4th Cir. 2005) (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir. 1997) (since defendant was "preparing to discharge [plaintiff] before [he] contacted any of the civil rights offices, it is not a

25

permissible inference that [he] was discharged because he contacted those offices")); *Trawick v. Hantman*, 151 F. Supp. 2d 54, 63 (D.D.C. 2001), *aff'd*, Civ. A. No. 01-5309, 2002 WL 449777 (D.C. Cir. Feb. 21, 2002) (because the termination process had already been initiated, no reasonable juror could conclude that the termination had been caused by the EEO activity).

### D.   The Agency Had Legitimate, Non-Retaliatory Reasons for Its Decision, and Plaintiff Cannot Identify Any Evidence from Which Pretext May Be Inferred.

#### 1.   *Legitimate, Non-Retaliatory Reasons to Remove Plaintiff from the Contract.*

Due to her unsatisfactory level of performance, Plaintiff was removed from continuing to perform under the contract.  Thus, the Agency had legitimate reasons for removing Plaintiff from the contract, and her performance was not ended because of any alleged protective activity.  Ex. FF (Jan. 11, 2018, deficiency email); *see also McDonnell Douglas*, 411 U.S. at 802; *Figueroa v. Pompeo*, 923 F.3d 1078, 1087-88 (D.C. Cir. 2019).

Specifically, on several occasions between October and December 2017, Robinson informed Plaintiff that she had made mistakes in reserving appropriate conference rooms for training programs, was improperly maintaining Agency databases, was not making sufficient progress on clearing a data entry backlog concerning training in the Commerce Learning Center, was improperly processing training request forms, was making errors while filing training request forms, was taking too long on training sign-in sheets, was making mistakes with meeting invitation settings, and had provided incorrect information to employees related to training locations and dates.  *See supra* at 5-6.  Robinson explained these deficiencies to Plaintiff.  *See* Ex. L (Robinson Tr.) at 106:8-16.  And Robinson also expressed her concerns to Hawthorne and provided Hawthorne a written list of the deficiencies.  *Id.* at 19:9-21:22; 26:18-30:18.

The central theme underlying each of these matters is Plaintiff's failure satisfactorily to perform her duties and responsibilities as a contractor, even after being given instructions by the

Agency's employees.  Courts routinely conclude that an employee's failure to follow instructions and unsatisfactory performance of duties and responsibilities are legitimate, non-discriminatory, and non-retaliatory bases for discipline.  *E.g.*, *Webster v. Dep't of Energy*, 443 F. Supp. 3d 67, 85 (D.D.C. 2020) ("fail[ure] to attend scheduled meetings with [a] supervisor," among other things, was a legitimate basis for removal); *Jones v. D.C. Water & Sewer Auth.*, Civ. A. No. 12-1424 (JEB), 2016 WL 659666, at *9 (D.D.C. Feb. 18, 2016) (addressing "disrespectful behavior toward . . . supervisors" is a legitimate, non-retaliatory reason for removal); *Baloch v. Kempthorne*, 550 F.3d 1191, 1200 (D.C. Cir.  2008) (affirming summary judgment for employer on retaliation claim where employer represented that it had taken action because of employee's "failure to comply with instructions or respect [his supervisor's] authority," noting that "good institutional administration justified disciplining [plaintiff] for these breaches of orders and office etiquette") (internal quotation marks omitted); *Batson v. Powell*, 912 F. Supp. 565, 578 (D.D.C. 1996) (employer had identified a legitimate, nondiscriminatory reason for removal where employee "disobey[ed] direct verbal and written orders," noting that an employer "is entitled to expect cooperation from his employee"); *Royall v. Nat'l Ass'n of Letter Carriers*, 507 F. Supp. 2d 93, 106 (D.D.C. 2007) (an employer states a legitimate, nondiscriminatory reason for an adverse employment action where the employee "understood the duties and responsibilities of the position . . . and simply failed to perform them in a satisfactory manner"); *Drewrey v. Clinton*, 763 F. Supp. 2d 54, 63 (D.D.C. 2011) ("employee's insubordination and his failure to perform his duties are legitimate, nondiscriminatory reasons for adverse employment actions"); *Hussain v. Gutierrez*, 593 F. Supp. 2d 1, 9 (D.D.C. 2008) (failure "to perform routine duties in a timely fashion" constitutes "a legitimate, nondiscriminatory reason for terminating" employee); *Gonda v. Donahoe*, 79 F. Supp. 3d 284, 295 (D.D.C. 2015) (citing *George*, 407 F.3d at 412) ("performance

below the employer's legitimate expectations" is one of the two "most common" "legitimate reasons for discharge"); *Carter*, 304 F. Supp. 2d at 31 ("Filing a Title VII action . . . is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination."); *Giles v. Transit Emps. Credit Union*, 32 F. Supp. 3d 66, 71 (D.D.C. 2014) ("Defendant has come forward with a legitimate non-discriminatory reason for the employment action that it took: it fired plaintiff based on her job performance."), *aff'd*, 794 F.3d 1 (D.C. Cir. 2015). The Court should likewise conclude here that the Agency had legitimate, non-retaliatory reasons for removing Plaintiff from continued performance under the contract between Ardent and the Agency.

Although Plaintiff may assert that her performance was "great" because Phillips, Plaintiff's supervisor, mentioned that she was doing well and he had not heard anything negative about her performance, the record shows that the Agency communicated with Plaintiff multiple times and indicated that her performance was insufficient. Moreover, Plaintiff's subjective self-assessment carries no weight. *McNally v. Norton*, 498 F. Supp. 2d 167, 183 (D.D.C. 2007) (a court "cannot credit [plaintiff's] subjective assessment of [her] own qualifications," because a "plaintiff's perception of [herself], and of [her] work performance, is not relevant" at this stage); *Waterhouse v. District of Columbia*, 124 F. Supp. 2d 1, 7 (D.D.C. 2000). Instead, "[i]t is the perception of the decision-maker that is relevant to determining pretext, not a plaintiff's perception of [her]self." *McNally*, 498 F. Supp. 2d at 183 (citation omitted). In short, even if Plaintiff strongly disagrees with the reasons she was removed from the contract, such disagreements do nothing to undercut the fact that the Agency had a legitimate reason for its actions. *See Fischbach*, 86 F.3d at 1183.

Accordingly, the Court should conclude that the Agency has satisfied its burden of demonstrating a legitimate, non-retaliatory basis for Plaintiff's removal from the contract.

> 2.   *There Is No Evidence from Which a Jury Could Conclude That the Identified Reasons Were Pretext for Discrimination or Retaliation.*

At this point, the Court considers whether Plaintiff has produced sufficient evidence for a reasonable jury to conclude that the Agency's legitimate reasons were pretexts for discrimination or retaliation. *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

Evidence of pretext may include the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, as well as any "other relevant evidence that a jury could *reasonably* conclude evinces an illicit motive." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (emphasis added).  A plaintiff must show "*both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (emphasis in original).  There is no such evidence available to Plaintiff.

Further, the question is not whether Plaintiff, the Court, or a jury believe that the removal from the contract was warranted for the specific infractions.  In assessing the legitimacy of an employer's explanation for a challenged action, "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183.  The Court "'may not second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" *Id.* (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)); *see also McGrath*, 666 F.3d at 1384-85.  Rather, Plaintiff must "produce[ ] sufficient evidence for a reasonable jury to find that the [Agency's] asserted non-discriminatory reason[s] w[ere] not the actual reason[s] and that the [Agency] intentionally discriminated against [her]." *Brady*, 520 F.3d at 494.  For this, Plaintiff cannot rely on conclusory or speculative allegations, as doing so "would defeat the central purpose of the summary judgment device."

*Greene v. Dalton*, 164 F.3d 671, 675 (D.D.C. 1999); *see also Hastie v. Henderson*, 121 F. Supp. 2d 72, 77 (D.D.C 2000).  Absent any actual evidence suggesting a discriminatory or retaliatory motive, speculative arguments invite "second-guess[ing] [of] an employer's personnel decision" that the precedent bars.  *Fischbach*, 86 F.3d at 1183.  Plaintiff has no such evidence.

Additionally, any suggestion of retaliation is further undercut by the fact that Robinson and Hawthorne agreed in the first instance to have Plaintiff placed at the Agency under the contract between the Agency and Ardent.  Ex. B (Ardent Human Resource Assistant candidate email).  "As this Circuit has explained, a plaintiff 'faces a significant initial hurdle' when the official who proposes the disciplinary action is the same person who hired the plaintiff, because 'it is difficult to impute to [that person] an invidious motivation that would be inconsistent with the decision to hire.'"  *See Akosile v. Armed Forces Ret. Home*, 141 F. Supp. 3d 75, 90 (D.D.C. 2015) (quoting *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011)).  Thus, Plaintiff will struggle to suggest that Hawthorne or Robinson had a discriminatory motive toward Plaintiff since they approved Plaintiff's placement at the Agency under the contract.

Further, even if Plaintiff could show that her December emails were in opposition to actions made unlawful by Title VII, the record shows sufficient evidence that Robinson had noted performance deficiencies in November and December prior to the alleged incident with Marlene Mitchell.  Moreover, the record shows multiple instances of Hawthorne noting that Plaintiff's time entries did not match with the times she was physically in the office and working.  For these reasons, which are supported by the record, the Agency's reasons for removing Plaintiff are legitimate, non-retaliatory reasons and are not a pretext for retaliation.

Thus, based on the overwhelming evidence that rebuts any inference of discrimination, Plaintiff cannot carry her burden of producing sufficient evidence for a reasonable jury to find that

the Agency's legitimate, non-retaliatory, reasons were pretextual.  *Adeyemi*, 525 F.3d at 1226. Thus, the Court should enter summary judgment in the Agency's favor.

## III.     **Retaliatory Hostile Work Environment (Count II) Claim Fails.**

Plaintiff alleges she was subjected to an abusive working environment in retaliation for having engaged in protected activity by complaining of harassment by a non-supervisory agency employee, Marlene.  Am. Compl ¶¶ 23-28.  This claim differs from the more typical claim of a discriminatory hostile work environment because Plaintiff must show intimidation based on the employee's participation in protected activity, rather than her membership in a protected class.  *Román v. Castro*, 149 F. Supp. 3d 157, 166 (D.D.C. 2016).

"[T]here is a high bar for 'demonstrating a hostile work environment claim.'"  *Mohmand v. Broad. Bd. of Governors*, Civ. A. No. 17-0618, 2018 WL 4705800, at *6 (D.D.C. 2018) (quoting *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 183 (D.D.C. 2016)).  The "crucial" requirements are that Plaintiff must show that she engaged in statutorily protected activity, and that the "workplace is permeated with [retaliatory] intimidation, ridicule, and insult" to retaliate against her for her protected activity, and such harassment was "sufficiently severe or pervasive [as] to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted); *see also Burkes v. Holder*, 953 F. Supp. 2d 167, 175 (D.D.C. 2013).

To determine "whether an actionable hostile work environment claim exists, [courts] look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002); *see also Baloch*, 550 F.3d at 1201.  Complaints about offhand

comments, rude treatment, callous behavior, or routine difference of opinion and personality conflicts will not amount to a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008). This standard "ensure[s] that Title VII does not become a general civility code" that involves courts in policing "the ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788 (citation and internal quotation marks omitted).

Here, Plaintiff claims that she was subjected to constant harassment by agency employees (*see* Am. Compl. ¶¶ 6-8), but, as noted above, Plaintiff testified that no Agency employee or supervisor, besides Marlene Mitchell, harassed her (Ex. A (Pl. Tr.) at 110:19-23, 112:4-12), and the only evidence of any complaint involved the December 21, 2022, interaction between Plaintiff and Marlene based on a disagreement over IT protocol (Ex. JJ (Pl.'s EEO Compl. and Supporting Docs. at 2, 10, 12-14, 15-16, 26-28)). *See supra* at 7-10, 23-24. There is no evidence of any other complaints, as Plaintiff admitted that she made no other complaints after December 21, 2022, and Hawthorne testified that Plaintiff never came to her with any complaints. Ex. A (Pl. Tr.) at 111:7-11; Ex. K (Hawthorne Tr.) at 64:19-65:2.

Viewing the evidence most favorably to Plaintiff, the identified conduct by her co-worker—amounting to one incident involving a misunderstanding about IT protocol—was merely inappropriate behavior in a professional office environment. Her complaints regarding this conduct were not protected activity because no reasonable employee could believe that the conduct about which she complained amounted to severe or pervasive harassment under Title VII. *See Grosdidier*, 709 F.3d at 24. The incident described falls well short of being "so objectively offensive" as to alter the conditions of Plaintiff's employment. *Oncale*, 523 U.S. at 81. Indeed, the incident at most constitutes insensitive treatment, cumbersome and potentially embarrassing

coworker interactions, a routine difference of opinion, and/or a personality conflict between Plaintiff and Marlene, but by no means did it amount to severe or pervasive harassment. *See, e.g.*, *Faragher*, 524 U.S. at 788; *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 188 (D.D.C. 2012) ("Bosses may be harsh, unfair and rude, but conduct so characterized does not necessarily rise to the level of a Title VII violation."); *Tyes-Williams v. Whitaker*, 361 F. Supp. 3d 1, 7 (D.D.C. 2019) ("disparaging remarks, criticisms of [the plaintiff's] work, and other negative comments do not make a hostile work environment") (quotation marks omitted); *Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 98 (D.D.C. 2007) (infrequent inappropriate comments and staring did not reach the level of "severe" or "extremely serious" conduct that is required by the Supreme Court to state a claim for hostile-work-environment discrimination); *Brooks v. Grundmann*, 748 F.3d 1273, 1277-78 (D.C. Cir. 2014) (outbursts and "tactless and ill-mannered" supervisors and coworkers do not establish a hostile work environment).  In fact, the incident here at issue is far less severe than what has been deemed insufficient in other cases. *See, e.g.*, *Brooks v. Grundmann*, 851 F. Supp. 2d 1, 6-7 (D.D.C. 2012) (rejecting claim about a supervisor slamming his hand on the table and throwing a notebook at an employee, issuing negative performance reviews, and isolating the employee); *Singh v. U.S. House of Reps.*, 300 F. Supp. 2d 48, 54-57 (D.D.C. 2004) (rejecting hostile work environment claim where employee was regularly humiliated, screamed at, and told to "shut up and sit down").

Moreover, Plaintiff's EEO Complaint only alleged a solitary isolated, minor incident, and Plaintiff therefore cannot advance a claim that she was subjected to severe, pervasive, or continuous conduct that is actionable under Title VII. *See Faragher*, 524 U.S. at 788 ("isolated incidents (unless extremely serious) will not amount to" a hostile work environment); *Stewart v. Evans*, 75 F.3d 1126, 1134 (D.C. Cir. 2002) ("Except in extreme circumstances, courts have

refused to hold that one incident is so severe to constitute a hostile work environment.  Even a few isolated incidents of offensive conduct do not amount to actionable harassment"); *Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (rejecting hostile work environment claims premised on employer's refusal to investigate or punish employees who slighted or disrespected plaintiff).

Further, "to sustain a hostile work environment claim . . . [Plaintiff] must produce evidence that she was discriminated against because of her [protected activity]."  *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) (citing *Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999)) (claim for hostile work environment failed where only three of fifteen alleged incidents had racial overtones); *see also Baloch*, 550 F.3d at 1201 (affirming summary judgment for defendant on plaintiff's hostile work environment claim because none of the employer's comments or actions focused on the plaintiff's race, religion, age or disability); *Hardin v. S.C. Johnson & Son, Inc.*, 167 F.3d 340, 345-46 (7th Cir. 1999) (hostile work environment claim failed where there was insufficient evidence that the alleged harassing behavior was motivated by discrimination); *Jones v. Billington*, 12 F. Supp. 2d 1, 12 (D.D.C. 1997) (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior").  Plaintiff's retaliatory hostile work environment harassment claim fails because there simply is no evidence to suggest that any incident occurred because of Plaintiff's alleged protected EEO activity (of which there was none until January 23, 2018), nor were any comments made by Hawthorne, Robinson, or Marlene regarding Plaintiff's protected activity.

Further, to establish a hostile work environment claim, a plaintiff must pass one additional hurdle: to establish liability when a plaintiff is harassed by his or her co-workers, the plaintiff must prove that the employer was at least negligent in not preventing or correcting the harassment.

*Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577 (D.C. Cir. 2013); *see also Faragher*, 524 U.S. at 789.   Again, Plaintiff only claimed to be harassed by a non-supervisory agency employee, and there is no evidence that the Agency acted negligently either in failing to prevent this one instance, or in correcting the harassment.   To the contrary, when Plaintiff submitted her complaint, Hawthorne immediately conducted an investigation.   Ex. K (Hawthorne Tr.) at 34:1-36:8, 40:12-43:1, 43:16-45:15. As discussed above, Hawthorne determined that both Marlene and Plaintiff had contributed to the incident, which could have been avoided if both individuals had remembered to remain professional in the workplace, including during disagreements about IT protocol.

Thus, based on the foregoing reasons, there simply is no evidence of the types of "intimidation, ridicule, and insult that is sufficiently severe or pervasive" based on Plaintiff's protected activity to support a retaliatory hostile work environment claim, *Achagzai*, 170 F. Supp. 3d at 183, and therefore Count II fails and judgment should be entered in favor of the Defendant.

*       *       *

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant Defendant summary judgment. A proposed order is enclosed.

Dated: July 25, 2022                          Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK,
Chief, Civil Division

*/s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
United States Attorney's Office
Civil Division
601 D Street, N.W.
Washington, D.C. 20530
Stephanie.Johnson5@usdoj.gov

*Attorneys for Defendant*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ROBIN R. BELL,<br><br>     *Plaintiff,*<br><br>  v.<br><br>GINA RAIMONDO,<br>Secretary of Commerce,<br><br>     *Defendant*. | Civil Action No. 19-3109 (CJN) |

**[PROPOSED] ORDER**

Upon consideration of the Defendant's Motion for Summary Judgement and the entire record in this matter, it is hereby:

ORDERED that the Defendants' Motion is GRANTED;

ORDERED that summary judgment is entered in favor of Defendant as to Plaintiff's remaining claims, Counts I and II.

This is a final, appealable Order.

Dated this ___day of _____, 2022.

           _____
            CARL J. NICHOLS
          UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ROBIN R. BELL,<br><br>    *Plaintiff,*<br><br>  v.<br><br>GINA RAIMONDO,<br>Secretary of Commerce,<br><br>    *Defendant.* | Civil Action No. 19-3109 (CJN) |

## **DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Local Civil Rule 7(h), Defendants submit the following statement of material facts as to which there is no genuine dispute:

1. Plaintiff was hired by Ardent Eagle Solutions ("Ardent") in August 2017 as a Human Resource Assistant.  Ex. A (Pl. Tr.) at 18:25-19:6, 19:14-17, 25:14-16.

2. On July 18, 2017, Joe Albano, Program Execution at Ardent, recommended Plaintiff for a position as a Human Resource Assistant to provide support under one of its contracts with the Training Program, Office of Workforce Development and Performance Management ("Workforce Development Office"), Office of Human Resources Management, Office of the Secretary, U.S. Department of Commerce, and Plaintiff was eventually placed as a contractor at the Agency under contract number SS1301-16-CQ-004.  Ex. B (Ardent Human Resource Assistant candidate email); Ex. C (Contractor Questionnaire - Kram) at 75; Ex. A (Pl. Tr.) at 19:18-24; Ex. D (Questionnaire - Hawthorne) at 171.

3. Plaintiff's role required specialized experience, education, and training.  Ex. B (Ardent Human Resource Assistant candidate email); Ex. A (Pl. Tr.) at 21:22-22:1, 26:8-10.

4.      Ardent employees were required to "ensure that all documents or reports produced by Contractors are suitably marked as Contractor products or that Contractor participation is appropriately disclosed."  Ex. E (Contract) at 95, 121.

5.      Plaintiff was a contractor with the Agency and was not a federal employee.  Ex. F (Phillips Tr.) at 56:9-15; Ex. C (Contractor Questions - Kram) at 75; Ex. A (Pl. Tr.) at 26:8-10; Ex. D (Questionnaire - Hawthorne) at 171.

6.      Plaintiff was paid by Ardent and Ardent managed Plaintiff's pay, time, and leave. Ex. G (Jan. 8, 2018, email); Ex. H (Jan. 23, 2018, email) at 152, 155; Ex. I (Nov. 28, 2017, email thread); Ex. A (Pl. Tr.) at 26:11-16.

7.      Ardent handled Plaintiff's worker's compensation claim.  Ex. I (Nov. 28, 2017, email thread).

8.      Plaintiff's resume was labeled with Ardent's logo.  Ex. J (Pl.'s Resume).

9.      Plaintiff also was not eligible for federal retirement benefits.  Ex. C (Contractor Questions - Kram) at 75.

10.      The Agency did give Plaintiff annual leave. Ex. D (Questionnaire - Hawthorne) at 172.

11.      The entire Workforce Development Office, including the training program, was managed by Deputy Director of the Office of Workforce Development and Performance Management Tomeji Hawthorne.  Ex K (Hawthorne Tr.) at 6:6-6:22, 7:1-2.

12.      Hawthorne did not supervise Plaintiff and had to defer to Ardent on any and all employment decisions regarding Plaintiff.  Ex. K (Hawthorne Tr.) at 10:2-12:9, 19:2-22, 26:2-27:17.

13.      Plaintiff was primarily supervised by two Ardent employees, Project Manager Dr.

Wesley Phillips, and Joseph Albano (Phillips' supervisor).  Ex. A (Pl. Tr.) 24:16-22; Ex. F (Phillips Tr.) at 7:10-11, 8:5-8, 11:17-21, 30:5-17.

14.     At the agency, Plaintiff was assigned to work alongside a federal employee, Human Resource Specialist Anesia Robinson.  Ex. K (Hawthorne Tr.) at 18:14-20; Ex. L (Robinson Tr.) at 6:10-12:7.

15.     Robinson was neither Plaintiff's supervisor, nor did she hold a management position.  Ex. K (Hawthorne Tr.) at 10:13-15; Ex. L (Robinson Tr.) at 13:18-19.

16.     On several occasions between October and December 2017, Robinson informed Bell that Bell (1) had made mistakes in reserving appropriate conference rooms for training programs;[5] (2) was improperly maintaining Agency databases, Ex. M (Nov. 29 - Dec. 5, 2017); (3) was not making sufficient progress on clearing a backlog of training data entry for the Commerce Learning Center, Ex. P (Nov. - Dec. 2017); (4) was improperly processing training request forms, Ex. Q (Nov. 28, 2017 – Jan. 6, 2018); (5) was making mistakes while filing training request forms, Ex. R (Sep. 2017 – Dec. 2017); (6) was taking too long on sign-in sheets for trainings, Ex. S (Nov. 30 - Dec. 7, 2017); (7) was making mistakes with meeting invitation settings, Ex. T (Jan. 8, 2018); and (8) and was providing incorrect information to employees relating to training locations and dates, Ex. U (Dec. 2017 – Jan. 2018).  Additionally, when certifying to Ardent the number of hours Plaintiff claimed to have worked on the contract, Hawthorne discovered that Plaintiff made errors in reporting her time to Ardent.  Ex. V (Nov. 21, 2017); Ex. W (Dec. 14, 2017); Ex. X  (Jan. 4, 2018).

---

[5]     For example, concerning a December 6-7, 2017, training program put on by an outside trainer from HCI, (Ex. M (Nov. 29 - Dec. 5, 2017); a retirement seminar (Ex. N (January 23-24)); and a forthcoming February 12-16, 2018, New Supervisory training program (Ex. O (Dec. 1 - 7, 2017)).  *See also* Ex. L (Robinson Tr.) at 20:10-13, 29:7-30:18.

17.     Additionally, between November 2017 and January 2018, Plaintiff began making errors in reporting her time to Ardent that Hawthorne discovered while certifying the number of hours that Plaintiff claimed to have worked on the contract with Ardent.[6]

18.     Robinson sat down with Plaintiff and went over these issues as they occurred to try to rectify the problems, but the problems continued.  Ex. L (Robinson Tr.) at 106:8-16.

19.     Robinson noted between November 2017 and January 2018 that Plaintiff "just wasn't performing as sharp as she had when she first started working in the office." *Id.* at 16:12-17:17.

20.     Eventually, Robinson spoke to Hawthorne when Robinson and Hawthorne returned from their holiday leave "to let [Hawthorne] know that I was worried about Bell because she was just not performing the same. She just was not herself. And I wanted to know if she knew what was going on or did she notice a change as well." *Id.* at 21:8-13.

21.     Robinson noted that "[t]here were things that had slipped through the cracks, and since the training program belonged to me, [Hawthorne] came to me to ask me what was going on." *Id.* at 20:5-7.

22.     On December 21, 2017, Plaintiff and Human Resources Assistant Margaline ("Marlene") Mitchell, a non-supervisory agency employee, in the Employee and Labor Relation Division, had a disagreement.  Ex. Y (Dec. 21, 2017, email).

23.     Plaintiff attempted to assist Marlene's co-worker, another agency employee, Liza, with a technical issue with her docking station malfunctioning.  Ex. Z (Mitchell Tr.) at 15:21-16:4; Ex. A (Pl. Tr.) at 80:13-81:9.

24.     After the incident, on December 21, 2017, Plaintiff emailed Director of the Office

---

[6]     Ex. V (Nov. 21, 2017); Ex. W (Dec. 14, 2017), 662; Ex. X  (Jan. 4, 2018).

of Workforce Development and Performance Management, Angela Ameen, and Hawthorne, stating that "I need to urgently request Jiji to move my seat. I had a situation with Marlene that's escalating.  So before she humiliates herself or me I am requesting to move."  Ex. Y (Dec. 21, 2017, email).

25.     Plaintiff explained that while she was doing a favor for Liza (another Agency employee), Marlene raised her voice in response to Plaintiff's explanation of IT protocol, "challenged me to follow her outside the office so she could let [Plaintiff] know ????????" Plaintiff then alleged that Mitchell followed Plaintiff around the office, said "she [was] done with" Plaintiff, and then gathered several other employees together to "give [Plaintiff] a hard time." *Id.*

26.     Plaintiff explained that the disagreement began regarding IT protocol and that "Marlene wants this BIG fight so it's very disgraceful and unladylike the way she handled herself…going to IT with this big presentation." *Id.*

27.     On December 22, 2017, Plaintiff emailed her personal email with a further synopsis of her interaction with Marlene:

> What happened was that Liza was having computer issues, I asked her did she want me to call IT, she said yes, so I did. While calling IT several times and NO answer, I told Liza that I (Robin) would walk down toI T sometimes when I didn't get an answer, Marlene interrupts and says :You not supposed to go down there, you got get a ticket first and wait for them ???????. I said ok but my experience is if I preparing for training and I call IT and get no answer, I will walk down there and they would help me with no problem. OMG then Marlene begins raising her voice "WELL THAT'S NOT RIGHT???????. I turned around put my earphones in and started working. Because I tuned her out, she goes from 1-100 in seconds and invades my space.

*See* Ex. AA (Dec. 22, 2017, Email) (errors in original).

28.     On December 26, 2017, Plaintiff emailed Director Ameen and Hawthorne, stating "I am officially filing a complaint against co-worker Marlene Mitchell on Thursday, December 21, 2017@ approximately 12:05 pm. I encountered a very serious situation with a co-worker

Marlene." Ex. BB (Dec. 26, 2017, Email).  Plaintiff explained the interaction with Marlene.  *Id.*

29.    Hawthorne investigated Plaintiff's complaint regarding Marlene's conduct and their disagreement that occurred on December 21, 2017.  Ex. K (Hawthorne Tr.) at 34:1-36:8, 40:12-43:1, 43:16-45:15.

30.    Hawthorne concluded that "there were differing statements" and employees needed to be mindful and cognizant of their behavior in the workplace.  *Id.* at 41:2-41:4.

31.    Hawthorne further concluded that the issue fundamentally pertained to misunderstanding of appropriate IT protocol and Plaintiff was not "in any type of situation in which she should be fearful or that there were raised voices, and that the entire incident could have been avoided."  *Id.* at 41:8-42:5.

32.    Hawthorne found that neither Marlene nor Plaintiff was solely at fault for the interaction and advised both to behave professionally in the workplace.  *Id.* at 44:10:14.

33.    Plaintiff testified that after the December 21, 2017, incident, Marlene's behavior toward her "got worse."  Ex. A (Pl. Tr.) at 88:1-90:12.

34.    Plaintiff does not allege that any other employees or supervisors other than Marlene harassed her.  Ex. A (Pl. Tr.) at 110:19-23, 112:4-12.

35.    Prior to December 21, 2017, Hawthorne did not receive any complaints from Plaintiff regarding Marlene's behavior.  Ex. K (Hawthorne Tr.) at 64:19-65:2.

36.    Plaintiff did not subsequently communicate with either Hawthorne, Ameen, Robinson, or Marlene about her December emails, nor did she make any other complaints about Marlene after December 21, 2017 incident.  Ex. K (Hawthorne Tr.) at 43:16-21; Ex. A (Pl. Tr.) at 111:7-11.

37.    On January 10, 2018, Plaintiff asked Hawthorne to temporarily move to an office

because she thought that would be "a safer option," without explaining further.  Ex. DD (Jan. 10, 2018, Email); Ex. A (Pl. Tr.) at 76:11-21.

38.     Hawthorne told Plaintiff that she was free to take her laptop to any open space huddle rooms whenever she wanted.  Ex. DD (Jan. 10, 2018, email); Ex. A (Pl. Tr.) at 76:11-21.

39.     On January 9, 2018, Hawthorne found that Plaintiff had incorrectly recorded her timesheet with Ardent again.  Ex. EE (Jan. 9, 2018, email).

40.     Hawthorne notified Ardent of the discrepancy in claimed hours versus Plaintiff's arrival/departure times, and informed Ardent that since Plaintiff was taking a "mental health day" she would follow up with Plaintiff the next day.  *Id.*

41.     On January 10, 2018, Hawthorne had a discussion with Robinson about the hours that Plaintiff was working—versus the hours she claimed to be working—and their impact on the operations of the training program.  Ex. L (Robinson Tr.) at 19:9-21:22; 26:18-30:18; Ex. FF (Jan. 11, 2018, deficiency email).

42.     During this discussion, Robinson raised her concerns about Plaintiff's declining performance, and Hawthorne requested Robinson send her written documentation of the performance deficiencies Robinson had noted and observed in Plaintiff's work product.  Ex. L (Robinson Tr.) at 19:9-21:22; 26:18-30:18.

43.     Hawthorne had a conversation with Phillips after the discussion with Robinson, and scheduled a meeting for Robinson, Phillips, Hawthorne, and Plaintiff to discuss the training program and the Agency's expectations for Ardent employees under the contract.  Ex. K (Hawthorne Tr.) at -26:2-22; Ex. LL (Training Meeting Invite).

44.     On January 11, 2018, Robinson emailed Hawthorne a list of seven areas of deficiencies in Plaintiff's fulfillment of Ardent's service contract with the Agency: scheduling

conference rooms, inadequately addressing the data entry backlog, data entry errors, delays in data entry, delays in processing training request forms, sending emails containing incorrect information to clients, and errors with purchasing order numbers.  Ex. FF (Jan. 11, 2018, deficiency email).

46. Hawthorne forwarded the email to Shane ("Anthony") Kram, the Department of Commerce Contracting Officer for the Ardent contract.  Ex. GG (Jan. 11, 2018, email).

46. In that email, Hawthorne explained that she learned of Plaintiff's performance deficiencies and spoke with Phillips about Plaintiff's performance on January 10, 2018, and noted that Plaintiff had had a slip-and-fall in early December and had a "verbal altercation . . . in late December." *Id.*

47. Kram forwarded Hawthorne's email to Plaintiff's supervisors and Ardent's point of contact for the Agency.  Ex. HH (Email from Kram to Ardent).  In this email, Kram stated, "It has become apparent that the individual will not meet a satisfactory level of performance and [Ardent] is requested to remove the person from performance under the contract today and replace with an individual who can meet performance standards at the earliest time possible."  *Id.*

48. On January 11, 2018, Wesley informed Plaintiff she was being removed from the contract between Ardent and the Agency.  Ex. HH (Email from Kram to Ardent); Ex. F (Phillips Tr.) at 23:3-26:11.

49. On January 23, 2018, Plaintiff initiated contact with the Agency's Equal Employment Opportunity ("EEO") Office alleging that Department of Commerce employees had retaliated against her.  Ex. II (Counseling Report) at 29-30.

50. On March 15, 2018, Plaintiff filed a formal EEO complaint with the Agency's EEO Office and only checked the box for retaliation.  Ex. JJ (Pl.'s EEO Compl. and Supporting Docs.) at 2.

51.     In the formal EEO Administrative Complaint, Plaintiff claimed she was retaliated against for reporting allegations of harassment by Agency employees, she was subjected to further harassment, and eventually was terminated from her position with Ardent.  *Id.* at 2-28.

52.     In her narrative statement and supporting documentation, Plaintiff only claimed that the Agency had retaliated against her for raising issues of non-specific harassment by an Agency employee.  *Id.* at 2-22, 26-28.

53.     Plaintiff's allegation in the administrative process was solely that "I, Robin Bell, was falsely terminated because I filed a harassment complaint against [Marlene]."  *Id.* at 26.

54.     On March 29, 2018, the Agency issued a final agency decision and dismissed Plaintiff's complaint for failing to state a claim upon which relief could be granted.  Ex. KK (FAD) at 6.

55.     The Agency determined that Plaintiff complained that she was subjected to harassment but failed to identify a basis of discrimination covered by Title VII, and her claims of retaliation were not covered by Title VII.  *Id.* at 4-6.

*     *     *

Dated: July 25, 2022

Respectfully submitted,

MATTHEW M. GRAVES, D.C. Bar # 481052
United States Attorney

BRIAN P. HUDAK,
Chief, Civil Division

*/s/ Stephanie R. Johnson*
STEPHANIE R. JOHNSON
D.C. Bar # 1632338
Assistant United States Attorney
United States Attorney's Office
Civil Division
601 D Street, N.W.
Washington, D.C. 20530
Stephanie.Johnson5@usdoj.gov

*Attorneys for Defendant*