UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBIN R. BELL,

    *Plaintiff*,

v.

GINA RAIMONDO,

    *Defendant*.

Civil Action No. 1:19-cv-03109 (CJN)

**MEMORANDUM OPINION**

This matter is before the Court on the government's Motion for Summary Judgment, ECF No. 51 ("MSJ"). Because Plaintiff Robin Bell did not engage in any statutorily protected activity before she was removed from her position at the Department of Commerce, the government's Motion is GRANTED.

**I.     Background**

Robin Bell is an African American female in her late fifties. *See* Am. Compl. ¶ 3, ECF No. 29-1; Opp'n SOF ¶ 1, ECF No. 57-1. In August 2017, she was employed by Ardent Eagle Solutions, *see* MSJ Ex. A, ECF No. 51-1/Opp'n Ex. 4 ECF No. 57-4 ("Bell Depo."), at 18–19, a company that contracts to provide Human Resource Assistants to the Department of Commerce, *see* Opp'n SOF ¶ 8, 13.[1]

---

[1] The parties agree that Bell was employed by Ardent, but they dispute her relationship to Commerce; the government contends that she was an independent contractor, and Bell contends that she was a joint employee of both Ardent and Commerce. *See* MSJ SOF ¶ 5, ECF No. 51; Pl. Disp. SOF ¶ 5, ECF No. 57-2; Opp'n SOF ¶ 12; Bell Depo. at 25. Because the Court grants the government summary judgment on other grounds, it does not address this issue.

Bell started at Commerce as a Human Resources Assistant in the fall of 2017. Opp'n SOF ¶ 11. In this position, Bell worked alongside another Human Resources Assistant, Marlene Mitchell. *Id.* ¶ 7. Bell also worked closely with Arnesia Robinson, a Human Resource Specialist. *See* MSJ Ex. L, ECF No. 51-12/Opp'n Ex. 7, ECF No. 57-7 (Robinson Tr.) at 6–12. And she worked with Angela Ameen and Tomeji Hawthorne, the Director and Deputy Director of the Office of Workforce Development and Performance Management, respectively. Opp'n SOF ¶¶ 2, 4–5.

Bell testified that she and Mitchell had a contentious working relationship for several months. For example, Bell stated that Mitchell routinely referred to her as a "b***h" instead of by her name. *See* Pl. Decl. at ¶ 8, ECF No. 57-3. Mitchell also loudly made comments such as "what that b***h doing" or "she's acting [w]hite today" while Bell was on the phone with vendors. *Id.* ¶ 10. And sometimes Mitchell's close friend Liza Wade would sit across from Bell and silently stare at her. *Id.* ¶ 17. All of this made it difficult for Bell to focus on her work. *Id.* at ¶ 9.

Bell contends that she had a conversation with Robinson in early November 2017 to request moving workspaces and to discuss Mitchell's behavior. *See* Opp'n to MSJ at 19–21 ("Opp'n"), ECF No. 56; Opp'n SOF ¶¶ 85–92; Bell Depo. at 68, 108–10, 163–67. Bell testified in her deposition that, once in private conversation, Robinson conjectured that Mitchell was picking on Bell because Mitchell, an African American woman, Opp'n SOF at ¶ 7, had a "problem with lighter color [African-American] women," like Robinson and Bell, and that Robinson had experienced similar problems with Mitchell in the past. *See* Bell Depo. at 68, 109–10, 163, 166. Bell further testified that she responded "I don't understand," *id.* at 109:8, and "it's sad[,] [i]t's really sad," *id.* at 110:10. (Bell also testified that she went into the conversation confused and questioning why Mitchell would treat her poorly, but, as she put it, Robinson "speculated" that

skin color could be the impetus.  *See id*. at 165.)  Bell attested that she had never heard anything like that about Mitchell before, and "if [Robinson] would not have shared[,]" she "would not have had a better understanding[,]" of the potential reason for Mitchell's alleged harassment.  *See id*.  Bell believes that this conversation happened on November 2 because of an email exchange between Bell and Robinson on the same date.  Pl. Ex. 21, ECF No. 57-21; *see also* Pl. Decl. ¶ 7.

Thereafter Bell sent Robinson several emails asking for a new workspace.  On November 17, 2017, Bell emailed Robinson asking permission to use Robinson's old office for several hours a day because the "volume of conversation/commotion throughout the day, distracts [her] work flow and interferes with talking to vendors, staff, etc."  Pl. Ex. 16 ("11/17/17 Email"), ECF No. 57-16.  She also wrote: "I know with our last conversation you understand my request."  *Id*.  After Robinson explained that this request would have to go through Hawthorne, Bell emailed Hawthorne on November 21.  *See* Pl. Ex. 17 ("11/21/17 Email"), ECF No. 57-17.  In that email, Bell asked "to use the focus room a few hours a day" "[d]ue to the volume of distraction during the day."  *Id*.  These requests were denied.

On December 21, 2017, Bell and Mitchell had a disagreement that led to Bell lodging a series of complaints.  *See* MSJ SOF ¶ 22; Pl. Disp. SOF ¶ 22.  Bell states that she attempted to assist Wade with a technical issue when Wade's docking station malfunctioned, but that Mitchell hostilely intervened.  *See* MSJ SOF ¶ 23; Pl. Disp. SOF ¶ 23; *see also* Am. Compl. ¶ 10.  The situation eventually escalated to Mitchell allegedly challenging Bell to a physical fight.  Opp'n SOF. ¶ 153.

Bell made a series of complaints on December 21.  She first verbally complained about the incident to Ameen.  *See* Am. Compl. ¶¶ 10–11; MSJ Ex. JJ at 27 ("Agency Compl."), ECF No. 51-36; Bell Depo. at 78, 85–87, 167–68.  Bell then emailed Ameen and Hawthorne, copying

Robinson, to report the incident in more detail. Bell wrote that Mitchell raised her voice, "challenged" her to follow Mitchell outside the office, and once they returned to the workspace, Mitchell followed Bell and assembled a group of other female co-workers to join her. *See* MSJ Ex. Y ("12/21/17 Email"), ECF No. 51-25; *see also* Bell Depo. at 85–86. She stated that she was "so tired" of Michell's behavior and asked to be moved to a different cubicle. *See* 12/21/17 Email. Later that day, Bell again emailed Ameen and Hawthorne, stating that she was leaving for the remainder of the workday to get some "breathing room," and that she would submit a "detail[ed] letter" the next day. *See id.*

The next day, Bell sent another email to Ameen and Hawthorne, to serve as an "official[]" "complaint" against Mitchell. *See* MSJ Ex. AA ("12/22/17 Email"), ECF No. 51-27. Bell described the December 21 incident in slightly more detail, reiterating that Mitchell intervened and then began yelling at her. *See id.* According to Bell, after Bell turned around and put headphones on, Mitchell "invade[d]" her workspace, "wave[d] her hand" in Bell's face and continued "ranting and raving" about IT protocol. *Id.* Mitchell then "jumped up[,]" and "lean[ed] over" Bell's desk "aggressively[,]" stated sarcastically that it was Bell's "world[,]" and that she "hat[ed]" her." *See id.*

Four days later, Bell emailed Ameen and Hawthorne, again noting the email as an "official[]" "complaint against . . . Mitchell[,]" describing the same events referenced in the prior emails, and stating that the incident "caught [her] totally by surprise and ended scary[,]" because she felt "threatened[.]" *See* MSJ Ex. BB ("12/26/17 Email"), ECF No. 51-28.

Hawthorne testified that she immediately investigated Bell's complaints. *See* MSJ Ex. K at 42 (Hawthorne Tr.), ECF No. 51-11. Hawthorne ultimately determined that Bell's and Mitchell's respective versions of events could not be reconciled and that neither was at fault, but

4

she advised both that they needed to behave more professionally going forward. *See id*. at 34–36, 40–41, 43–45. Hawthorne determined that Bell was not threatened and was not "in any type of situation in which she should be fearful or that there were raised voices," and that the incident was fundamentally a disagreement over IT protocol that "could have been avoided." *Id.* at 41–42, 45.

On January 10, 2018, Bell again emailed Hawthorne, asking to change workspaces to be "safe for now." *See* MSJ Ex. DD ("1/10/18 Email"), ECF No. 51-30. Hawthorne denied the request to permanently change workspaces, but noted several open workspaces on other floors where Bell could take her laptop. *See id*. Shortly thereafter, Ameen emailed Hawthorne: "Need to close out the allegation of an unsafe working environment." Pl. Ex. 24, ECF No. 57-24.

The next day, Bell was removed from her position at Commerce. *See* Opp'n SOF ¶¶ 180–83. The government contends this action was taken because of Bell's poor work performance, *see* MSJ SOF ¶¶ 44–48, while Bell argues that it was taken in retaliation for her complaints about Mitchell, *see* Agency Compl. at 2, 26–28.

## II.   Procedural History

Bell initiated contact with Commerce's Equal Employment Opportunity Office of Civil Rights ("OCR") on January 23, 2018. Am. Compl. ¶ 16; *see* MSJ Ex. KK at 1 ("FAD"), ECF No. 51-37; MSJ at 12–13; *see generally* 29 C.F.R. § 1614.105. The charges were not resolved, and on March 15, 2018, Bell filed her formal OCR Agency Complaint. *See* Agency Compl. at 2, 23–25.

On the Agency Complaint's charge sheet, Bell checked off only unspecified "retaliation" as the basis of Commerce's alleged wrongdoing. *See id.* at 2. Bell also attached the December 2017 emails, *see id.* at 3–22, 23–25, and an additional undated three-page narrative statement, *see id*. at 26–28. Throughout these documents, Bell characterized the Agency Complaint as one for "retaliation" and "wrongful termination," *see, e.g.*, *id.* at 2, 5, but did not specify any discriminatory bases. Collectively, the Agency Complaint and its exhibits allege that Mitchell

harassed Bell; that when Bell complained internally in December 2017, her supervisors took no action to address the issues, and furthermore, denied her request to permanently move to a different area, *see id*. at 6–22; FAD at 2; that the harassment worsened after the December complaints, to the point that Bell felt the need to tape a mirror in her cubicle so that she could monitor the behavior of her co-workers behind her, *see* Agency Compl. at 27–28; FAD at 2; that on January 10, 2018, Hawthorne unfairly attributed the conflict to Bell; *see* Agency Compl. at 28, FAD at 2, and that, in retaliation for her complaints, Bell was wrongfully terminated on January 11, 2018, *see* Agency Compl. at 2, 26–28; FAD at 2.

OCR issued its Final Agency Decision on March 29, 2018, dismissing Bell's Agency Complaint for failure to state a claim. FAD at 4–6. OCR concluded that Bell did not allege "that the harassing treatment to which she was subjected related to a protected basis, such as race, color, religion, sex, national origin, age, or disability[,]" and that Bell "checked a box indicat[ing] that she believed that she had been retaliated against, but provided no further information on the complaint form itself." *Id.* OCR further noted that Bell's accompanying narrative statement only "alleged that she had been subjected to acts of retaliation, including being terminated, for reporting harassment by Agency employees who worked with her." *Id.* at 5. OCR also deemed any age discrimination claims to have been abandoned because Bell did not raise them in the Agency Complaint. *See id.* at 6 n.1.

Next, Bell filed a *pro se* "Petition for Agency Review" in the United States Court of Appeals for the Federal Circuit. That court concluded that it lacked subject matter jurisdiction and transferred the matter to the United States District Court for the District of Maryland, which in turn granted a conceded Motion to Transfer Venue to this District. Bell obtained counsel in March 2020 and thereafter filed an Amended Complaint. *See* ECF Nos. 23, 29-1.

The Amended Complaint raised the existing retaliation claims, *see* Am. Compl. ¶¶ 18–28, and attempted to raise anew sex and gender discrimination claims under Title VII, *see id.* ¶¶ 37–42, age discrimination and retaliation claims pursuant to the Age Discrimination in Employment Act ("ADEA"), *id.* ¶¶ 43–51, and disability discrimination and failure to accommodate claims in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act"), *id.* ¶¶ 29–36. The government filed a Second Motion to Dismiss and/or for Summary Judgment, ECF No. 30, and Bell filed a separate Motion for Discovery, ECF No. 32.

Upon review of those Motions, as well as the additional briefing from both parties, the Court granted and denied both Motions in part. *See* Mem. Op. at 20, ECF No. 39. The Court dismissed all of Bell's claims alleging discrimination of any kind arising from her age, sex, gender, or disability (Counts III–VII), for failure to exhaust. *See id.*; Ord. at 1, ECF No. 38. Bell's claims for retaliatory discharge and retaliatory hostile work environment (Counts I & II) survived the Motion, and discovery was permitted only as to those specific claims and their related-subject areas. *See* Mem. Op. at 19–20.

After the close of discovery, the government filed its pending Motion for Summary Judgment.

### III.   Standard of Review

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is not "genuine" unless "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party has met its burden, the nonmoving party must then set forth "specific facts showing that there is a genuine issue for trial" to defeat the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Although "summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of [her] obligation to support [her] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Baylor v. Powell*, 459 F. Supp. 3d 47, 53 (D.D.C. 2020) (quotation omitted), *aff'd*, 847 F. App'x 7 (D.C. Cir. 2021). As "conclusory allegations" and "unsubstantiated speculation" will not suffice to create genuine issues of material fact, "[s]ummary judgment for a defendant is most likely when a plaintiff's claim is supported solely by the plaintiff's own self-serving, conclusory statements." *Bell v. E. River Fam. Strengthening Collaborative, Inc.*, 480 F. Supp. 3d. 143, 149 (D.D.C. 2020) (quotation omitted).

### IV.  Discussion

Title VII "forbids retaliation by employers against employees who report workplace . . . discrimination" on the basis of race, color, religion, sex, or national origin. *See Crawford v. Metro. Gov't of Nashville*, 555 U.S. 271, 273 (2009). "The Title VII antiretaliation provision has two clauses, making it 'an unlawful employment practice for an employer to discriminate against any of his employees . . . [1] because he has opposed any practice made an unlawful employment practice by this subchapter, or [2] because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.'" *Id.* at 274 (quoting 42 U.S.C. § 2000e–3(a)).[2] "To establish a prima facie case of retaliation, a plaintiff must demonstrate that she engaged in a protected activity and that her employer took materially adverse action against her because she engaged in that protected activity." *Clemmons v. Acad. for Edu.*

---

[2] Here, the parties agree that only the former, more informal, "opposition" clause is applicable, *see* MSJ at 23; Opp'n at 19–23. Bell neither contacted the OCR, nor filed a formal charge, *see* FAD at 1; Agency Compl., until after she was removed, *see* MSJ SOF at ¶49; Pl. Disp. SOF¶ 49; and thus, could not have suffered retaliation from those actions.

*Dev.*, 107 F. Supp. 3d 100, 128 (D.D.C. 2015) (citing *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013)) (italics omitted).

The government raises several independent grounds for granting summary judgment, but the Court addresses only one: Bell did not engage in statutorily protected activity before she was removed from her position at Commerce.

"An activity is protected for the purposes of a retaliation claim if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006) (quotations omitted).

Although informal complaints—i.e., occurring outside of the OCR administrative process—may constitute protected activity, "[n]ot every complaint garners its author protection." *See Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006). To start, the "alleged discriminatory treatment" cannot be "generic; rather, the plaintiff must be opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation." *Lemmons*, 431 F. Supp. 2d at 91–92 (citing *Broderick*, 437 F.3d at 1232). A complaint of being "picked on," without mentioning discrimination based on one's protected class, does not constitute protected activity, even if the employee honestly believes that she is the subject of discrimination. *See Broderick*, 437 F.3d at 1232 (citing *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 727–28 (7th Cir. 2003)). "Accordingly, the complaints and reports that [Bell] identifies as [her] 'protected activities' must have in some way alleged discrimination on the basis of race, color, religion, gender or national origin." *Hunter v. District of Columbia*, 905 F. Supp. 2d 364, 379 (D.D.C. 2012) (citing 42 U.S.C. §§ 2000e–2, 2000e–3(a)), *aff'd sub nom. Hunter v. D.C. Gov't*, No. 13-7003, 2013 WL 5610262 (D.C. Cir. 2013).

9

Additionally, the informal complaint cannot be ambiguous. "[A]mbiguous complaints that do not make the employer aware of alleged discriminatory misconduct do not constitute protected activity." *Bowyer v. Dist. of Columbia*, 910 F. Supp. 2d 173, 209 (D.D.C. 2012) (quotation omitted), *aff'd*, 793 F.3d 49 (D.C. Cir. 2015). And "[a]lthough courts have held that protected 'opposition' activity need not be an explicit discrimination complaint voiced by the plaintiff and communicated to her employer, the law requires, in the absence of such a complaint, that a Title VII plaintiff's 'opposition' activity must in some way relate to allegations that would plainly signal discrimination if they were true." *Wang v. Washington Metro. Area Transit Auth.*, 206 F. Supp. 3d 46, 79–80 (D.D.C. 2016). Bell's "protected activities" therefore must have in some way unambiguously signaled discrimination on the basis of race, color, religion, gender or national origin.

Bell contends that she "engaged in multiple protected activities." Opp'n at 21. Specifically, Bell identifies: the emails that she sent to Ameen and Hawthorne about Mitchell on December 21, 22, and 26, *see id.* at 21–23, the emails that she sent to Robinson in mid-November about moving to another workspace, *see id.* at 22, and the conversation with Robinson on November 2, 2017, *see id.* at 19–21. But none of these activities was protected under Title VII.

To start, in none of Bell's emails did she reference unlawful discrimination. *See Clemmons*, 107 F. Supp. 3d at 129. Her November emails reference only unwanted traffic and noise around her desk. *See* 11/17/17 Email; 11/21/17 Email. And her December emails likewise do not complain of discrimination based on a protected characteristic. *See* 12/21/17 Email; 12/22/17 Email; 12/26/17 Email. Bell "may have complained . . . about [Mitchell's] hostility" in those emails, "but the record contains no facts to support an inference that she ever raised concerns about race discrimination[,]" or any other kind of discrimination, "in doing so." *See Squires v.*

*Gallaudet Univ.*, No. 20-1348, 2021 WL 4399554, at *9 (D.D.C. Sept. 27, 2021); *see also Battle v. Master Sec. Co., LLC*, 298 F. Supp. 3d 250, 253 (D.D.C. 2018) (finding that plaintiff's memorandums and emails describing "many episodes of harassment, deterrence and unfair labor practices[,]" did not "amount[] to protected activity" because they did not identify any "discrimination that would be unlawful under Title VII").

As for Bell's conversation with Robinson, the Court cannot consider that as a premise for her retaliation claims because it was not raised before OCR. In Bell's initial narrative complaint to OCR, she did not mention that conversation or make any reference to race; instead, she explained that her November emails were sent because "of the traffic and loudness" around her desk. *See* Agency Compl. at 26. Moreover, no mention of the conversation appears in OCR's counseling activities report. *See* MSJ Ex. II, ECF No. 51-35; indeed, the administrative record contains no mention of that conversation.

In any event, that conversation would not be sufficient to defeat the Motion for Summary Judgment. Bell's claimed responses of "I don't understand" and "it's sad" are—at best—ambiguous complaints of unlawful discrimination. *See Bowyer*, 910 F. Supp. 2d at 209; *cf. Cole v. Boeing Co.*, 75 F. Supp. 3d 70, 80 ("References to the observations and perceptions of others are not evidence that [the plaintiff] complained of activity made unlawful by Title VII.").[3] And Bell's subsequent actions were serious counterweights to any potential reference to race discrimination her employer might have gleaned. After all, in the various emails Bell sent thereafter, she made no mention of discrimination based on any protected characteristic. *See*

---

[3] The parties also dispute whether Robinson was Bell's de facto supervisor, and thus whether any complaint to Robinson matters for the purposes of retaliation. *See* MSJ at 4; Opp'n at 18, 20–21. Because Bell's claims fail either way, the Court assumes for the sake of argument that Robinson was Bell's supervisor.

11/17/17 Email; 11/21/17 Email; 12/21/17 Email; 12/22/17 Email; 12/26/17 Email; 1/10/18 Email. Rather, Bell's November emails related to the noise and traffic around her desk, *see* 11/17/17 Email; 11/21/17 Email, and her December complaints were that Mitchell "rais[ed] her voice," "follow[ed]" Bell to her desk, and made Bell feel "threatened." *See, e.g.*, 12/21/17 Email. And, as explained, no mention of race was made to the OCR. *See generally* Agency Compl.

Bell is therefore left with the December 21 incident and her complaints about it. Bell made no reference to any protected characteristic in her verbal or written complaints about this incident, and so these complaints were not protected activities. *See* Bell Depo. at 78, 85–87, 167–68 (verbal complaints); 12/21/17 Email; 12/22/17 Email; 12/26/17 Email. Therefore, Bell did not engage in any protected activities before she was removed from Commerce and her retaliation claims must fail.

## V.   Conclusion

For the foregoing reasons, the government's Motion for Summary Judgment is GRANTED. An appropriate order will follow.

DATE:  March 28, 2023

                                                          CARL J. NICHOLS
                                                          United States District Judge